**AFFIRMED; Opinion Filed May 29, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00125-CV

**JEFFREY LEIBOVITZ AND SEQUOIA FRANKFORD SPRINGS 23, L.P., Appellants**

**V.**

**SEQUOIA REAL ESTATE HOLDINGS, L.P., Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-14357-F**

## OPINION

Before Justices Myers, Evans, and O'Neill[1]
Opinion by Justice Myers

Jeffrey Leibovitz and Sequoia Frankford Springs 23, L.P. (SFS 23) appeal the trial court's judgment enjoining them from breaching a settlement agreement, awarding Sequoia Real Estate Holdings, L.P. damages of $2,500 against Leibovitz for breach of the settlement agreement, and awarding Holdings attorney's fees of $200,000 against both appellants. Appellants bring thirteen issues on appeal contending the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses, imposing an injunction on appellants, awarding Holdings damages, and awarding Holdings attorney's fees against SFS 23. We affirm the trial court's judgment.

---

[1] The Hon. Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

## BACKGROUND

In 2006, Leibovitz sold investment property in California. The law permitted Leibovitz to defer the taxes due from that sale by investing the proceeds in another investment. Holdings, which was operated by Donald Behunin, created real-estate investment offerings, including Sequoia Frankford Springs, an investment offering concerning an apartment complex in Dallas.[2] In the Private Placement Memorandum (essentially a prospectus) for the Sequoia Frankford Springs investment, Holdings offered qualified investors[3] the opportunity to purchase tenancies in common in the complex and promised a 6.5 percent annual return. Leibovitz invested the tax-deferred money in Frankford Springs as a tenant in common with twenty-seven other tenant-in-common investors. As required by the Private Placement Memorandum, Leibovitz created the limited partnership SFS 23 to purchase and hold the investment.

The structure of the investment and what happened to the money is complex involving many entities including the name "Sequoia," and the structure is not entirely clear from the record. However, it appears the Frankford Springs apartment complex was purchased in 2006 by Sequoia Frankford Springs, L.P. The twenty-eight tenant-in-common investors, through Sequoia Frankford Springs, L.P., paid cash (Leibovitz testified he invested cash of $378,781.50), executed a nonrecourse note for $21,400,000, and granted the lender a deed of trust to secure the note. According to the Private Placement Memorandum, the money and debt provided by the investors was to be used to purchase the property, create certain reserves, and pay expenses

---

[2] All of the investment offerings created or overseen by Behunin and mentioned in the record included the word "Sequoia" in the name. Thus, the investment offering concerning the Frankford Springs apartment complex was called "Sequoia Frankford Springs." Likewise, all of the entities involved in the ownership or management of the investments also included the word "Sequoia" in their names.

[3] The Private Placement Memorandum required that each investor "have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of an investment in an Interest and have the ability to protect your own interests in connection with such investment." Each investor also had to qualify as an "accredited investor" under the Securities Act of 1933 by being (1) "a natural person who had had individual income in excess of $200,000 in each of the two most recent years, or joint income with your spouse in excess of $300,000 in each of these years, and have a reasonable expectation of reaching the same income level in the current year;" (2) "a natural person and your individual net worth, or joint net worth with your spouse, exceeds $1,000,000 at the time you purchase the Interests;" or (3) "an entity . . . in which each equity owner is an accredited investor." *See* 17 C.F.R. § 230.215(e), (f), (h) (codification of rule 501 of Regulation D defining "accredited investor").

described in the Private Placement Memorandum. The investors signed a master lease agreement with Sequoia Frankford Springs LeaseCo, LP (LeaseCo) as Master Tenant, which was to pay rent to the investors of $789,653 per year, which would provide a return of over 6.5 percent to the investors on their cash investment. LeaseCo would manage the property through its contractor, Sequoia Real Estate Management, L.P., and sublease the units to the individuals who would actually reside in the apartments and pay rent. LeaseCo would pay Real Estate Management four percent of the gross revenues earned by the apartment complex. Behunin was the president of Holdings; the president, secretary, treasurer, and sole manager of LeaseCo's general partner; and the chief executive and chief financial officer of Sequoia Real Estate Management.

The investors in Frankford Springs received only 4.64 percent return on investment instead of the promised 6.5 percent. In 2009, LeaseCo missed some note payments to the lender. On February 10, 2010, the lender notified LeaseCo that the note was in default. On June 4, 2010, the lender notified LeaseCo that the loan was accelerated and the property posted for foreclosure. When the investors learned Behunin and LeaseCo had stopped paying the note and that the property was facing foreclosure, some of them, including Leibovitz, questioned Behunin and the Sequoia entities' management of the project, including why the money generated by the property was not used to pay the note. Behunin sued Leibovitz and other investors for libel and business disparagement.

Another group of investors, not including Leibovitz, sued Behunin and the Sequoia entities operating Frankford Springs. In this lawsuit, the investors alleged that Behunin and the Sequoia entities committed fraud by failing to provide necessary information in the Private Placement Memorandum, misrepresented the expected return on investment at 6.5 percent when the appraisal of the property showed only a 4.64 percent return was possible and that the

–3–

property would lose money, and misrepresented the condition of the property as being satisfactory when the property required $508,000 of capital improvements in the first three and one-half years of operation. The investors also alleged Behunin and the Sequoia entities breached the agreement with the investors to make the payments on the note by failing to make three of those payments and then further breached the agreement by failing to forward the lender's notice of default to the investors. The investors alleged Behunin and the Sequoia entities converted about $128,000 of the property's funds.

For almost a year, negotiations continued with the lender and amongst the parties to the two lawsuits. Effective March 31, 2011, the bank agreed to reinstate the loan, and the parties to the lawsuits and all the investors and business entities involved in Frankford Springs entered into a settlement agreement. Before reinstating the loan, however, the lender required the payment of about $1,256,400 in past due principal, interest, escrow deposit, and fees. To pay this amount, Holdings made a "cash call" to the investors to pay their pro-rata share of the amount. Sequoia Frankford Springs, L.P, deeded the property to the investors. In the "Settlement and Mutual Release Agreement" (the Agreement), the parties agreed to dismiss the two pending lawsuits against one another. The Agreement provided for the distribution of the funds from the cash call. The Agreement also terminated the Master Lease with LeaseCo and provided that a new management group, unaffiliated with Behunin and the Sequoia entities, would manage the property under a new asset management agreement.[4] The Agreement contained a "Confidentiality and Non-Disparagement" provision in which the parties agreed not to disclose the terms and conditions of the Agreement "to any individual or entity." The provision stated that the parties "further agree not to make any derogatory, disparaging and/or untruthful

---

[4] Besides managing the investment offering, Behunin was also a tenant in common in the investment. As part of the settlement, Behunin transferred about twenty-five percent of his investment (valued by Behunin at about $282,000) to the other investors. This transfer increased Leibovitz's percentage of ownership from 3.118 percent to 3.197 percent.

statements about any other party to any person or entity." The Agreement stated that violation of this provision would be a breach of the Agreement and would entitle the non-breaching party to immediate injunctive relief against further violations of the provision. Leibovitz signed the Agreement as manager of SFS 23's general partner and signed on his own behalf agreeing that he was bound by the terms and conditions of the Agreement.

After signing the Agreement, Leibovitz learned that some of the money from the initial cash investment was being used in ways he believed were not disclosed in the Private Placement Memorandum. Holdings, managed by Behunin, was the sponsor of four other tenancy-in-common investment offerings in the Dallas area, which operated similarly with a "LeaseCo" entity as the master tenant managing the property and paying rent to the investors. Leftover funds from the initial investment of each offering were pooled in Holdings. Holdings would then lend that money to master tenants, including Frankford Springs LeaseCo, that needed funds to pay rent to the investors. Only one of the properties, not Frankford Springs, was able to pay its rent to the investors solely from the operations of the property. Thus, many investors were paid the rent from their own investment funds and with the investment funds from other properties instead of from the funds the properties actually earned by leasing to residents.[5] In this case, LeaseCo did not inform appellants and the other investors that the property was not generating sufficient income to pay the rent to them and that the rent was being paid by LeaseCo borrowing money from Holdings.

On November 8, 2011, Leibovitz sent an e-mail to the brokers that sold him the investment stating that, unless the brokers paid Leibovitz for the losses he suffered through the investment, he would file complaints with the Financial Industry Regulatory Authority (FINRA)

---

[5] Behunin revealed how remaining investment funds were pooled in Holdings. Behunin's statements were part of his testimony in bankruptcy court in 2011 concerning the bankruptcy of another Sequoia tenancy-in-common investment.

and the Securities and Exchange Commission (SEC) and send copies of the complaints to all the investors in Holdings' other investment offerings. Holdings then filed the current suit seeking an injunction barring Leibovitz from filing the complaint with FINRA and the SEC and from communicating with investors in the other investment offerings.[6] The trial court issued a temporary restraining order. At the hearing on the temporary injunction, Leibovitz testified that unless he was enjoined from doing so, he would file a complaint with FINRA and would send a copy of the complaint to the investors in Holdings' other investment offerings.

Leibovitz asserted numerous affirmative defenses to Holdings' claims. Holdings moved for summary judgment on the defenses. The trial court granted summary judgment on most of the defenses. Holdings' claim of breach of contract was tried before a jury, which found Leibovitz liable and found Holdings suffered damages of $2,500.

The trial court's judgment awarded Holdings damages of $2,500 against Leibovitz and attorney's fees of $200,000 against both appellants. The court also imposed a permanent injunction on appellants, prohibiting them from (a) disclosing the existence or terms of the Agreement to anyone not a party to the Agreement; (b) communicating with any of the investors in Holdings' other investment offerings that appellants had threatened to contact; and (c) bringing or asserting any claims relating to the "dispute" as defined in the Agreement. The trial court stated in the order that the permanent injunction did not prohibit appellants from reporting a crime to law-enforcement authorities or from providing testimony in response to an inquiry from any regulatory authority as long as appellants did not initiate the inquiry.

Appellants now appeal from this judgment.

---

[6] Behunin testified that he and the Sequoia entities he controlled assigned their claims against appellants to Holdings.

## RELEASE PROVISIONS IN THE AGREEMENT

The parties' Settlement and Mutual Release Agreement stated that the parties, which included appellants, Holdings, and Behunin,

> hereby fully and finally mutually release one another of and from any and all presently existing claims, demands, promises, causes of action, and/or similar rights of any type of whatever kind or nature ("Claim"), whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present.

> In further exchange for the covenants and consideration set forth herein, the Parties agree that they will not bring or assert in any manner, either directly or indirectly, any Claims, professional grievances, professional liability claims, allegations of misconduct, litigation, arbitration and/or any other form of adversary proceeding relating to and/or arising in any way out of any presently existing claim relating to the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present, whether same is presently known or unknown.

> For the purpose of implementing a full and complete release and discharge of each other, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, any and all claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of those claims.

> . . . .

> It is the express intention of the Parties to this Agreement that these mutual releases and associated definitions be construed as broadly as possible to effectuate the Parties' desire for absolute and complete peace going forward in relation to all dealings between them whatsoever. The Parties do not intend to except any entity or claim of any kind from these releases, except breaches of this Agreement.

The Agreement defined "the Dispute" as "any and all issues and matters that have been discussed and debated relating to, *among other things, including without limitation*, the Property, the Master Lease Agreement, the TIC [Tenants in Common] Agreement and/or the PPM [Private Placement Memorandum]."

## SUMMARY JUDGMENT

In their first five issues, appellants contend the trial court erred by granting Holdings' motion for summary judgment on their affirmative defenses. The standard for reviewing a

traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 549; *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied). When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm the summary judgment if any of the summary judgment grounds are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Furmanite Worldwide, Inc. v. NextCorp., Ltd.*, 339 S.W.3d 326, 331 (Tex. App.—Dallas 2011, no pet.).

### Fraud

In the first three issues, appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses of fraudulent inducement, fraudulent concealment, and fraud by nondisclosure. Appellants alleged Holdings committed fraud leading to the Agreement by failing to inform appellants that the funds they and the other investors in the property invested were placed in an integrated fund with investment monies from other Holdings investment projects and not used solely for Frankford Springs. Appellants alleged Holdings commingled the funds of numerous real estate projects and used those funds as needed for all the real estate projects. Appellants alleged these facts were required to be

disclosed in the Private Placement Memorandum but were not disclosed. Appellants also alleged Holdings failed to disclose a due-diligence report stating that the Frankford Springs real estate project would never perform as represented.

Holdings moved for summary judgment on the fraud defenses, asserting appellants disclaimed in the Agreement the element of reliance necessary for appellants' affirmative defenses based on fraud. Reliance by the party asserting fraud is an element of the defenses of fraudulent inducement, fraudulent concealment, and fraud by nondisclosure. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (false representation "was intended to be and was relied upon by the injured party" as element of fraudulent inducement); *Wise v. SR Dall., LLC*, 436 S.W.3d 402, 409 (Tex. App.—Dallas 2014, no pet.) ("the listener relies on the nondisclosure resulting in injury" is element of fraud by nondisclosure); *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 439 (Tex. App.—Fort Worth 1997, pet. denied) ("plaintiff's reasonable reliance on the deception" is element of fraudulent concealment).

In general, a contract is subject to avoidance on the ground of fraudulent inducement. However, in some situations, the parties can agree in the contract to waive the right to assert fraud as a defense to breach of the contract by expressly disclaiming reliance. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex. 2008); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997). The factors most relevant to whether there was a waiver of reliance precluding an affirmative defense of fraud are whether:

> 1. the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> 2. the complaining party was represented by counsel;
>
> 3. the parties dealt with each other in an arm's length transaction;
>
> 4. the parties were knowledgeable in business matters; and
>
> 5. the release and non-reliance language was clear.

*Forest Oil Corp.*, 268 S.W.3d at 60. The court also added a sixth factor, stating the fact that an agreement is a "once and for all" settlement constitutes an additional factor for rejecting fraud-based claims. *Id.* at 58.

Concerning the fifth factor, the supreme court stated the factor with reference to clarity of the release language, but throughout the opinion, the court examined the clarity of the non-reliance language as well. For example, "[a]n all-embracing disclaimer of any and all representations . . . shows the parties' clear intent." *Id.* at 58; *see also id.* at 59 ("the release . . . mak[es] clear that at the time of the agreement, the parties disclaimed reliance"). In rejecting the argument that the breadth of the clear non-reliance language should be viewed as limited to the more narrow release language, the court reasoned that the parties' agreement "makes clear the parties intended an exhaustive waiver unconfined to claims specifically released." *Id.* at 59. Therefore, we understand that the subject of the fifth factor is the clarity of both the language effecting the release and the language disclaiming reliance.

Whether a contract's disclaimer-of-reliance provision negates an assertion of fraud as a defense is a question of law reviewed de novo. *Id.* at 55 & n.9.

The Agreement provided,

**D. <u>Jointly Drafted; Savings Clause</u>**

The Parties[7] . . . agree that this Agreement was jointly drafted and shall not be construed against any party. . . .

. . . .

---

[7] The agreement defined "Owners" as meaning all the limited partnerships that owned an interest in the property, including SFS 23, and the partnerships' general partners, including Leibovitz and his wife. "Parties" was defined as including the Owners, "Sequoia" (which was defined as including specific Sequoia entities, including Holdings, and their owners, officers, directors, employees, etc.), and Behunin. Thus, appellants were both "Owners" and "Parties" as defined in the agreement.

**J. Review and Understanding of Agreement**

> a. The Parties . . . acknowledge and agree that they have carefully read this Agreement and have asked any questions needed to understand the terms, consequences and binding effect of this Agreement.
>
> b. Each Owner acknowledges and agrees that the Attorneys have not made and will not make any representations, warranties and/or covenants with respect to any federal, state or local income tax consequences to the Owners . . . .
>
> c. The Parties . . . acknowledge and agree that they are sophisticated and that they had an opportunity to review this Agreement with independent legal counsel, accountants, CPAs, advisors and/or other professionals or representatives of their own choosing.
>
> d. The Parties . . . further understand that this Agreement is the full, final and complete agreement between the Parties, even if the final tax consequences and/or monetary distributions are different from what was original[ly] anticipated by the Owners.
>
> e. The Parties . . . represent and warrant that they have been fully informed and have full knowledge of all of the terms, provisions, conditions, and effects of this Agreement, and they are fully satisfied with the terms and effects of this Agreement.
>
> f. The Parties . . . warrant and represent that they have full standing and capacity to enter into this Agreement, that they execute this Agreement of their own free will and accord for the purposes and the consideration set forth herein.
>
> g. The Parties . . . warrant and represent that no promise or inducement has been offered or made, except as herein set forth, and that this Agreement is executed voluntarily *and without reliance* upon any statement or representation by any party, lawyer or third party.

(Footnote and emphasis added.)

*Negotiation of the Terms of the Contract that Are the Subject of the Current Dispute*

The first factor set forth in *Forest Oil Corp.* for determining whether a disclaimer of reliance is enforceable is whether "the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute." *Forest Oil Corp.*, 268 S.W.3d at 60. In this case, the Agreement states that it was "jointly drafted" by the parties, which indicates its terms were

–11–

negotiated. Also, Leibovitz states in his affidavit of August 9, 2012, that there were negotiations leading to the Agreement: "With regards to claims by Plaintiff in their MSJ facts that I was never represented by the law firm of Walters [Balido] and Crain in the review and negotiation of the subject settlement agreement in the lawsuit styled *Tamera Franklin et al. v. David Freeman et al.*, Cause No. 10-10364, 193rd Judicial District, Dallas County, Texas [sic]." The "subject settlement agreement" of the *Franklin v. Freeman* lawsuit is the Agreement, so appellants have conceded the Agreement was negotiated. This is evident from the provision of the Agreement that the parties would dismiss with prejudice their claims in the "Franklin-Behunin-SREM Lawsuit," which was defined as meaning "Case No. DC-10-10364-L." The cause numbers of the lawsuits mentioned in the affidavit and in the Agreement are the same. Therefore, "the subject settlement agreement," the "negotiation" of which Leibovitz states he was not represented by "Walters [Balido] and Crain," was the Agreement at issue in this appeal. Accordingly, appellants have conceded the Agreement was negotiated.

Appellants also argue that the parties did not specifically discuss the issues that became the topics of this dispute, namely, (1) Behunin's combining the funds of multiple investment projects and using the funds from Frankford Springs to pay the shortfalls of other investments managed by Behunin and his entities, and (2) Holdings' failure to include the due diligence report showing the unprofitable nature of Frankford Springs in the Private Placement Memorandum. Under appellants' interpretation, then, "the issue which has become the topic of the subsequent dispute" is the factual basis of the subsequent fraudulent inducement claim. We disagree. Under *Forest Oil Corp.*, "the topic of the subsequent dispute" is the specific contract term being asserted against the party claiming fraud.[8] This interpretation goes along with the rest

---

[8] Part of the difficulty of interpreting the meaning of the language arises from the fact that the supreme court set forth the factors in *Forest Oil Corp.* but did not expressly apply them.

–12–

of the factor that "the terms of the contract were negotiated, rather than boilerplate." *Forest Oil Corp.*, 268 S.W.3d at 60. The terms of the contract and the factual basis of the subsequent fraud claim are such different concepts that we believe the supreme court would have made them different factors. Also, in *Forest Oil Corp.*, the court's analysis of the enforceability of the contract concerned the terms of the contract Forest Oil was seeking to enforce, an arbitration provision and a disclaimer of reliance, not the allegations in the subsequent lawsuit.

In *Forest Oil Corp.*, the disclaimer of reliance stated the parties were not "relying upon any statement or any representation of any agent of the parties being released." *Id.* at 54 n.4. The parties released all claims "in any manner relating to" certain oil and gas leases. *Id.* at 53. The parties also agreed to arbitrate all claims for environmental damage and personal injuries "relating to" the leases. When McAllen sued Forest Oil for environmental damage, Forest Oil invoked the arbitration clause. *Id.* at 54. McAllen argued the arbitration provision was induced by fraud and was therefore unenforceable because a lawyer for Forest Oil told him there was no environmental contamination on the property. *Id.* at 55. McAllen argued that the disclaimer of reliance applied only to the released claims and not to the arbitration provision. *Id.* at 58–59. The supreme court disagreed and stated, "the parties disclaimed reliance with respect to *all* decisions being made during negotiations, including the decision to resolve future disputes regarding environmental and personal-injury claims via arbitration." *Id.* at 59. The court's decision was not based on any similarity between the topics of discussion during negotiations and the factual allegations of McAllen's fraudulent inducement claim.

Likewise, in this case, "the parties disclaimed reliance with respect to *all* decisions being made during negotiations," *id.*, including the decisions that the parties released one another "from any and all presently existing claims . . . , whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property, and/or any other matter whatsoever from the

beginning of time to the present." Appellants do not assert on appeal that the parties failed to discuss this release provision in their negotiations.

However, even if it were required that the parties had to have discussed the facts of the subsequent lawsuit, the facts discussed by the parties during negotiation of the Agreement were closely related to the facts alleged in this lawsuit. The Agreement settled the two pending lawsuits, which involved the issues of what happened to the money generated by the property and appellee's failure to disclose information in the Private Placement Memorandum showing that the investment could not meet the promised rate of return and would be unprofitable. These lawsuits were dismissed by the Agreement. Appellants' claims of fraud in this case—the failure to disclose in the Private Placement Memorandum the integration of the investment funds for Frankford Springs with those of other investment projects and the failure to disclose the due diligence report showing the unprofitability of the investment—involve those same issues of what happened to the money in the investment and the failure to disclose necessary information in the Private Placement Memorandum. *See Tex. Std. Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.*, 394 S.W.3d 753, 772 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("However, the *Forest Oil* court did not opine that the parties must have discussed the exact grounds that form the basis of the subsequent dispute, in order to satisfy this factor."); *cf. Forest Oil Corp.*, 268 S.W.3d at 58 (parties' negotiations discussed environmental matters and treatment of surface issues, which touched on the subject of the fraud, the burying of highly toxic, mercury-contaminated material on the property).

We conclude appellants have not shown the trial court erred by determining "the parties specifically discussed the issue which has become the topic of the subsequent dispute."

*Representation by Counsel*

Concerning whether appellants were represented by counsel before signing the Agreement, a provision of the Agreement (not quoted above) states that Joel M. Eastman was the attorney for the "Owners," which the Agreement defined as including Leibovitz and SFS 23.[9] The Agreement also states appellants "had an opportunity to review this Agreement with independent legal counsel." In an e-mail, Leibovitz referred to "my attorney" addressing Leibovitz's concerns about the defamation lawsuit, which was one of the disputes leading to the Agreement. In his affidavit, Leibovitz stated that Walters Balido & Crain were not representing him on the settlement agreement. However, that testimony is not evidence that he did not have counsel to advise him about the Agreement.

Leibovitz also testified in his deposition that he did not have counsel to advise him on the Agreement and that Eastman did not represent him or SFS 23. Even if Leibovitz signed the Agreement without consulting an attorney, the Agreement states, and Leibovitz does not dispute, that he "had an opportunity to review this Agreement with independent legal counsel." The fact that Leibovitz had the opportunity to consult a lawyer (as stated in the Agreement) and the evidence that he had access to attorneys (as shown by his representation by an attorney in the defamation lawsuit and the Agreement's statement that there was an attorney for the Owners) support enforcement of the waiver-of-reliance provision. *See RAS Grp., Inc. v. Rent-A-Center E., Inc.*, 335 S.W.3d 630, 640 (Tex. App.—Dallas 2010, no pet.) (fact that parties had lawyers they regularly used and had the opportunity to consult with them supported enforcement of disclaimer-of-reliance clause even though parties testified they could not remember if they submitted the agreement to their lawyers). Leibovitz's personal decision not to protect his

---

[9] The Agreement also stated that Eastman was not the attorney for Behunin and his limited partnership that was one of the tenants in common in the investment.

–15–

interests by having counsel advise him on the Agreement should not bar enforcement of the waiver-of-reliance provision.

*Arm's-Length Transaction*

The record also shows the Agreement was an arm's-length transaction. At the time of the Agreement, Leibovitz and other investors were in litigation against Holdings, and the record shows there were attorneys on all sides. Leibovitz admitted in his affidavit that there were "negotiations" leading to the Agreement. We conclude this evidence established the Agreement was an arm's-length transaction.

*Knowledgeable in Business Matters*

The next factor is whether the parties were knowledgeable in business matters. The Agreement states the parties "are sophisticated." In order to invest in the project, Leibovitz and his wife must have had combined incomes of more than $300,000 per year for the preceding two years and prospects of the same for the following year or assets of more than $1 million. *See supra* note 3. Leibovitz states in his affidavit that he is not a lawyer, real estate broker, or securities investment professional, but these facts do not show he was not "sophisticated." Moreover, the Private Placement Memorandum required that all investors state in writing that they "have such knowledge and experience in financial and business matters that [they] are capable of evaluating the merits and risks of an investment in an Interest and have the ability to protect [their] own interests in connection with such investment." By entering into the investment with these requirements, Leibovitz conceded he was knowledgeable in business matters.

*Clarity of the Release and Disclaimer-of-Reliance Language*

The language of the release and non-reliance clauses is clear. In addition to the parties releasing one another from "any and all presently existing claims, demands, promises, causes of

–16–

action, and/or similar rights of any type of whatever kind or nature ("Claim"), whether known or unknown, relating to and/or arising in any way out of the Dispute, the Property and/or any other matter whatsoever from the beginning of time to the present," those who signed the Agreement acknowledged that they did so "voluntarily *and without reliance* upon any statement or representation by any party, lawyer or third party." (Emphasis added.) In other words, the parties did not rely on any representation by any other party when they gave up any rights they may have had regarding a complaint about another party that existed on March 31, 2011, the effective date of the Agreement, regardless of whether the complaining party knew of the complaint's existence, and concerning any "matter whatsoever, from the beginning of time to the present."

*"Once and for All" Settlement*

The Agreement is clear that the settlement was intended to be a "once and for all" settlement. The Agreement stated,

> For the purpose of implementing a full and complete release and discharge of each other, the Parties expressly acknowledge that this Agreement is intended to include in its effect, without limitation, any and all claims that the Parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of those claims.
>
> . . . .
>
> It is the express intention of the Parties to this Agreement that these mutual releases and associated definitions be construed as broadly as possible to effectuate the Parties' desire for absolute and complete peace going forward in relation to all dealings between them whatsoever. The Parties do not intend to except any entity or claim of any kind from these releases, except breaches of this Agreement.

The Agreement could not be clearer that the parties intended the Agreement to be a "once and for all" settlement of all claims related to the investment. As the supreme court stated in *Forest Oil Corp.*, the fact that an agreement is a "once and for all" settlement is an additional factor for rejection of fraud-based claims. *See Forest Oil Corp.*, 268 S.W.3d at 58.

–17–

*Special Relationship*

Appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defenses of fraudulent concealment and fraudulent inducement because there was a special relationship between Holdings and appellants resulting in a fiduciary duty to disclose material facts and information related to the investment. Regardless of the factual basis for the assertion of fraud, appellants would have to prove reliance, which they disclaimed. Appellants do not cite any authority concluding that a disclaimer of reliance is not enforceable by a fiduciary against a party to whom the duty was owed. *See Tex. Std. Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.*, 394 S.W.3d 753, 774–76 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (supreme court has not expressly held that fiduciary relationship bars disclaimer of reliance).

*Conclusion*

After considering all six factors under *Forest Oil Corp.*, we conclude the Agreement's provision that appellants disclaimed the element of reliance necessary to bring a fraudulent concealment, fraudulent inducement, or fraud by nondisclosure affirmative defense is enforceable against appellants as a matter of law. We overrule appellants' first, second, and third issues.

**Misprision of Felony**

In their fourth issue, appellants contend the trial court erred by granting Holdings' motion for summary judgment on appellants' affirmative defense of misprision of felony. Appellants assert the enforcement of the confidentiality provision of the Agreement would prevent appellants from reporting Holdings' and Behunin's felonious activities, which would make

appellants guilty of the federal offense of misprision of felony.[10]  Appellants argue that because the Agreement cannot be performed without the commission of a crime, the Agreement violated public policy and is void.

Title 18, section 4 of the United States Code provides:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4.  Misprision of felony has four elements:  (1) a felony was committed; (2) the accused had knowledge of the felony; (3) the accused failed to notify authorities; and (4) the accused took an affirmative step to conceal the crime.  *United States v. Davila*, 698 F.2d 715, 717 (5th Cir. 1983).

"A contract to do a thing which cannot be performed without a violation of the law is void."  *Lewis v. Davis*, 199 S.W.2d 146, 148–49 (Tex. 1947) (quoting *Tex. Emp'rs' Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Com. App. 1926, judgm't adopted)).  When the illegality does not appear on the face of the contract, it will not be held illegal and thus void unless the facts showing its illegality are before the court.  *Id.* at 149.

The confidentiality provision in the Agreement stated:

### L. <u>Confidentiality and Non-Disparagement</u>

As mutual consideration for entering into this Agreement, the Parties, the Released Group, and each of their respective attorneys agree and acknowledge that the fact of this Agreement and the terms and conditions of this Agreement, including the amount of consideration paid in connection with the resolution of the Dispute are confidential and shall not be disclosed to any individual or entity. All Parties, members of the Released Group, and their attorneys agree that the response to any inquiry by anyone about the status or disposition of the lawsuits

---

[10] Appellants assert Holdings committed the offenses of misapplication of fiduciary property over $200,000, TEX. PENAL CODE ANN. § 32.45(c)(7) (West Supp. 2014), exploitation of an elderly individual, *id.* § 32.53, and violations of the Texas Securities Act, TEX. REV. CIV. STAT. ANN. art. 581-29 (West Supp. 2014).

or any Claims related to the Dispute or the Property shall be limited to the following: "The case was resolved by the agreement of the parties." *Notwithstanding the above, any party may disclose such information to the extent reasonably necessary for the purpose of tax or securities law compliance and/or other legitimate business purposes and/or responding to any other regulatory proceedings or inquiry or as otherwise required by any law or governmental rule or regulation or court order.*

> The Parties and each member of the Released Group further agree not to make any derogatory, disparaging and/or untruthful statements about any other party to any person or entity (although this restriction shall not be construed to limit any party's truthful testimony). The Parties and each member of the Released Group, as well as their respective attorneys, acknowledge and agree that these confidentiality provisions are material terms of this Agreement and substantial inducements to the settlement of this matter. The Parties and each member of the Released Group further acknowledge and agree that any violation of this paragraph shall be a breach of this Agreement entitling the non-breaching party, in addition to any other rights or remedies afforded at law or in equity, to immediate injunctive relief against any further violations thereof.

(Emphasis added.) To the extent parts of this provision may prohibit a party from reporting another party's illegal activities to an "authority under the United States," those prohibitions are nullified by the statement that the Agreement does not prohibit a party from disclosing information as required by law. Under this provision, the Agreement would not prevent appellants from reporting felonious activities, if any, to the appropriate authorities. Therefore, as a matter of law, the Agreement may be enforced without any party being guilty of misprision of felony.

We overrule appellants' fourth issue.

### Economic Duress

In their fifth issue, appellants contend the trial court erred by granting summary judgment on appellants' affirmative defense of economic duress. Appellants alleged they signed the Agreement because Behunin and Holdings had withheld payment of the mortgage and threatened

to let the property go into foreclosure unless all the parties to the Agreement signed it.[11] Appellants assert "[t]here was a scintilla of evidence creating a material issue of fact."[12]

Economic duress is a defense to enforcement of a contract. *King v. Bishop*, 879 S.W.2d 222, 224 (Tex. App.—Houston [14th Dist.] 1994, no writ). The elements of the defense are: (1) a threat to do something that the threatening party has no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection. *Simpson v. MBank Dall., N.A.*, 724 S.W.2d 102, 109 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Whether the conduct or acts of the party accused constitute duress is a question of law, but whether duress exists in a particular situation is a question of fact dependent upon the circumstances surrounding the situation, including the mental effect on the party claiming duress. *Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, No. 04-13-00529-CV, 2014 WL 7185081, at *15 (Tex. App.—San Antonio Dec. 17, 2014, no pet. h.); *Matthews v. Matthews*, 725 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

Holdings moved for summary judgment on several grounds, including that there was no economic duress as a matter of law because appellants expressly disclaimed any duress. The Agreement stated,

> I. **No Duress or Undue Influence** . . .
>
> The Parties and the Released Group acknowledge and agree that they enter into this Agreement voluntarily and without any duress or undue influence.

---

[11] This case involves a claim of economic duress concerning the subject matter of the Agreement. The alleged threat in this case does not involve a threat of physical harm or criminal wrongdoing. Whether actual, physical duress, such as a threat of physical harm to a person, could ever be disclaimed in a contract is not before us, and we make no determination of that issue. Likewise, we make no determination of whether a threat of harm to economic interests with no relation to the Agreement could be disclaimed or whether a threat of criminal wrongdoing to the economic interest that is the subject of the contract could be disclaimed.

[12] We presume appellants mean there was more than a scintilla of evidence. A mere scintilla of evidence does not create a material fact issue and, in legal effect, is no evidence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

The parties presented almost no argument and cited no cases concerning whether economic duress can be disclaimed in a contract. Likewise, we have found no authority on the subject. However, just as the element of reliance may be expressly waived in certain cases where it is clear that adequate due-process protections exist, so also should the parties be allowed to include a term that the parties were not under duress when they signed it. As the supreme court stated in *Schlumberger*, "Parties should be able to bargain for and execute a release barring all further dispute." *Schlumberger*, 959 S.W.2d at 179. The supreme court stated "[t]his principle necessarily contemplates that parties may disclaim reliance on representations." *Id.* If parties may disclaim reliance in a case that meets all the factors set forth in *Schlumberger* and *Forest Oil Corp.*, then we fail to see why the right of the parties "to bargain for and execute a release barring all further dispute" should not permit the parties to disclaim economic duress. Where an arms-length contract is negotiated, the parties are sophisticated, they are represented by counsel or had the opportunity and means to obtain representation, the disclaimer of duress is clear, and the parties intended for the contract to create an end to all disputes between them, we conclude that parties may disclaim economic duress. As discussed above, the Agreement meets all of these factors. Accordingly, we conclude as a matter of law that appellants' statement that they signed the Agreement "voluntarily and without any duress or undue influence" is enforceable.

We overrule appellants' fifth issue.

## INJUNCTION

In the sixth through ninth issues, appellants contend the trial court erred by granting Holdings' request for a permanent injunction against SFS 23. Appellants do not challenge the applicability of the injunction to Leibovitz.

The trial court's order imposing the injunction states appellants would breach the Agreement by (1) filing new claims; (2) contacting Holdings' investors and making known to

them the derogatory allegations of such claims; and (3) making the terms of the Agreement public. The court observed that both appellants expressly consented in the Agreement to injunctive relief to prevent further violations of the Agreement. The court ordered that appellants (a) not disclose the existence or terms of the Agreement to anyone not a party to the Agreement; (b) not communicate with Holdings' 160 other investors; and (c) not bring any claims, grievances, or other litigation relating to or arising out of any claim relating to the Dispute as defined in the Agreement, the property, Holdings, or any other matter. The order stated it did not prohibit appellants from providing testimony requested by any state or federal regulatory authority, and it did not prohibit appellants from reporting a crime to law enforcement officials.

Appellants contend the trial court should not have granted the injunction against SFS 23 because Holdings failed to prove the elements required to obtain an injunction. To be entitled to a permanent injunction, a plaintiff must plead and prove (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 970 (Tex. App.—Dallas 2013, no pet.). We review the trial court's grant or refusal of a permanent injunction to determine whether it clearly abused its discretion. *Priest v. Tex. Animal Health Comm'n*, 780 S.W.2d 874, 875 (Tex. App.—Dallas 1989, no writ). The trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). A trial court's clear failure to analyze and apply the law correctly constitutes an abuse of discretion. *See Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 380 (Tex. App.—Dallas 2009, no pet.). Under an abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds for reversal, but the sufficiency of the evidence is a relevant factor in

determining whether the trial court had sufficient evidence to exercise its discretion. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

When reviewing the legal sufficiency of the evidence, we consider all the evidence, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). If the evidence furnishes a reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact. *Id.*

When reviewing the factual sufficiency of the evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Cameron v. Cameron*, 158 S.W.3d 680, 683 (Tex. App.—Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the fact finder was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 782 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Hinkle*, 223 S.W.3d at 782.

**Wrongful Act**

Appellants argue there was no evidence SFS 23 performed or threatened to perform a wrongful act. They argue that Holdings had to show an act or threat by SFS 23 separate or independent of any threat or act by Leibovitz. We disagree. Limited partnerships, such as SFS 23, act only through their general partners, and Leibovitz was the manager of the corporation that was SFS 23's general partner. *See* TEX. BUS. ORGS. CODE ANN. §§ 153.102, .152(a)(1) (West 2012); *Nw. Otolaryngology Assocs. v. Mobilease, Inc.*, 786 S.W.2d 399, 404 (Tex. App.—Texarkana 1990, writ denied) ("A limited partnership acts only through its general partner."). Appellants do not contest that Leibovitz performed or threatened to perform a wrongful act, and Leibovitz admitted at trial that he breached the Agreement. Behunin testified that Leibovitz threatened to communicate with the investors in other Sequoia offerings about the problems in the Sequoia Frankford Springs offering.[13] Leibovitz was the manager of SFS 23's general partner. The trial court could have concluded Leibovitz breached the Agreement in his role as manager of SFS 23's general partner as well as on his own behalf.

**Breadth of the Injunction**

Appellants also contend the inclusion of SFS 23 in the injunction made the injunction overly broad. Rule of civil procedure 683 provides that injunctions are "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." TEX. R. CIV. P. 683. Appellants contend SFS 23 does not fall into these categories because it was not "in active concert or participation" with Leibovitz. We

---

[13] Appellants argue that their threatened derogatory statements or disparagement of Holdings to investors in other Sequoia investments was not a proper ground for the injunction because Holdings withdrew that claim for breach of contract. We disagree. At the conclusion of the first day of the jury trial, the attorney for Holdings stated that Holdings was not seeking to prove breach of contract beyond those grounds for breach of contract on which the trial court had granted summary judgment for Holdings. Those grounds for breach of contract on which the trial court granted summary judgment included "anticipatory repudiation" and "disparagement." These grounds appear to include appellants' threat to send a copy of a FINRA claim to the investors in other Sequoia investments. Therefore, appellants' argument that this ground was a not proper ground for the injunction because Holdings waived it lacks merit.

disagree. Leibovitz was the manager of SFS 23's general partner. The evidence did not show that Leibovitz's actions in breach of the Agreement were made solely on his own behalf and not on behalf of SFS 23. The trial court could conclude from the evidence that SFS 23 was "in active concert or participation with" Leibovitz.

**Imminent Harm and Irreparable Injury**

Appellants also argue there was no evidence of imminent harm or irreparable injury. An injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). As part of the Agreement, appellants promised not to make derogatory or disparaging statements about any other party to the Agreement to any person or entity. In an e-mail sent to the brokers who enrolled Leibovitz in the Sequoia Frankford Springs investment offering, Leibovitz threatened to file a complaint about the investment with FINRA and to send that complaint to the 160 investors in the other Sequoia investment offerings. At the hearing on whether to impose a temporary injunction, Leibovitz testified that unless he were enjoined, he would file the complaint with FINRA and send a copy of it to every investor in the other Sequoia investment offerings. Behunin testified that Leibovitz's threatened actions, if carried out, would "significantly" damage Holdings' reputation and require "significant time and money" to repair. The trial court could construe this evidence as showing an imminent threat to disparage and make derogatory remarks about Behunin, Sequoia Frankford Springs, and Holdings to persons who were not parties to the Agreement.

"[A]ssigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied). The trial court could determine from Behunin's testimony that Leibovitz's threat to

send copies of a FINRA claim to the investors in the other Sequoia investments, if carried out, would cause Holdings injury that either cannot be compensated by damages or that cannot be measured by any certain monetary standard.

We conclude there was legally and factually sufficient evidence of imminent harm and irreparable injury.

### No Adequate Remedy at Law

Appellants also assert Holdings failed to prove it lacked an adequate remedy at law. An existing legal remedy is adequate if it is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief. *Brazos River Conservation & Reclamation Dist. v. Allen*, 171 S.W.2d 842, 846 (Tex. 1943); *Hilb, Rogal & Hamilton Co. of Tex. v. Wurzman*, 861 S.W.2d 30, 32 (Tex. App.—Dallas 1993, no writ). Behunin's testimony that it would take "significant time" to repair the damage from appellants carrying out the threat to send the FINRA complaint to the investors in the other Sequoia investments shows that enjoining appellants from contacting the other investors before he carried out the threat was a more efficient remedy than any award of damages after appellants had sent the complaint to the other investors. We conclude there was legally and factually sufficient evidence that Holdings lacked an adequate remedy at law.

### Prior Restraint on Speech

Appellants also contend the injunction is an illegal prior restraint on speech. Appellants cite two cases, *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1930), and *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971). In *Near*, a permanent injunction barred a newspaper from ever publishing again because of its history of publishing defamatory articles. *Near*, 283 U.S. at 706. The Supreme Court held that such a restraint on future speech was unconstitutional even though it was preceded by defamatory material. *Id.* at 722–23. In *Keefe*, a group of

picketers and pamphleteers was enjoined from protesting a real estate developer's business practices, *Keefe*, 402 U.S. at 417, and the Court held this restraint on free expression unconstitutional, *id.* at 419–20. Neither case is applicable to the case before us. In this case, appellants agreed not to engage in certain actions, including disparagement of the other parties, and appellants agreed that violation of that provision could be enforced through injunctive relief. *Near* and *Keefe* did not involve such agreements, which is an important distinction between those cases and the facts before us. If appellants' theory of the law were correct, then any agreement not to disclose information would be unenforceable, which is clearly not correct. *See Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 888 (Tex. App.—Dallas 2003, no pet.) ("A non-disclosure agreement may be enforceable even if a covenant not to compete is not."); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Dallas 1992, no writ) ("nondisclosure covenants are not against public policy").

Appellants also cite article 1, section 8 of the Texas Constitution, which provides,

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

TEX. CONST. art. I, § 8. However, appellants do not cite any case where the enjoined party had agreed in a written contract to a restriction on his speech and agreed that the restriction could be enforced through injunctive relief.

In this case, the prior restraint on appellants' speech was the Agreement. The injunction was narrowly tailored and did nothing more than enforce the restraint on speech appellants agreed to in the Agreement. We conclude appellants have not shown the injunction constituted an illegal prior restraint.

We overrule appellants' sixth through ninth issues.

**JURY CHARGE**

In their tenth issue, appellants contend the trial court erred by submitting a damages question instructing the jury to measure Holdings' damages under the benefit-of-the-bargain standard. The rules of civil procedure require the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. A valid instruction assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). The trial court has considerable discretion when framing a jury charge. We do not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). A trial court abuses its discretion by failing to follow guiding rules and principles. *Id.*

The sole jury question in this case was:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Sequoia Real Estate Holdings, L.P. ("Sequoia") for its damages, if any, that resulted from the failure of any of the following to comply with the Settlement Agreement?

> Consider the following elements of damages, if any, and none other.

> The difference, if any, between the value Sequoia gave in connection with the Settlement Agreement on March 31, 2011 and the value Sequoia received from the Settlement Agreement at the time of the breach.

> Do not add any amount for interest on damages, if any.

> Answer separately in dollars and cents for damages, if any, for those named below:

> a. Jeffrey Leibovitz: *$2,500.00*

> b. Sequoia Frankford Springs 23, LP: *–0–*

(Jury's answers in italics.)

For damages, Behunin testified to the interest in the investment and potential earnings he and the Sequoia entities gave up as part of the Agreement. Behunin personally gave up about

$300,000 of his limited partnership interest to the other limited partners, and about $2,800 of that interest went to SFS 23, which was owned and controlled by Leibovitz. Additionally, the Sequoia entities, by giving up the management of the property, gave up the right to receive about $819,000 in management fees they probably would have earned and the right to six percent of the price for the eventual sale of the property, which Behunin estimated would probably have been at least $2.1 million. The Sequoia entities also gave up control of the escrows and reserves, worth about $274,000. According to Behunin, he and the Sequoia entities he controlled gave up about $3.5 million for the settlement. Leibovitz conceded that he breached the agreement. When asked what he thought the amount of damages he should pay as a consequence of his breaches of the Agreement, Leibovitz stated he would "give Mr. Behunin back his $2,800." Leibovitz then said, "I believe $2,800 is fair." The jury awarded Holdings $2,500 against Leibovitz.

The jury question asked the jurors to measure Holdings' damages under the benefit-of-the-bargain standard, which is the difference in the value given and the value received. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). Appellants contend that in a suit for breach of a settlement agreement, the jury should be asked to determine the amount of consequential damages the plaintiff suffered, that is, the natural, probable, and foreseeable consequence of the defendant's breach of the settlement agreement, including the attorney's fees the plaintiff incurred in defending the settlement agreement. Appellants cite two cases in support of their argument: *Widener v. Arco Oil & Gas Co.*, 717 F. Supp. 1211 (N.D. Tex. 1989), and *Ganske v. WRS Group, Inc.*, No. 10-06-00050-CV, 2007 WL 1147357 (Tex. App.—Waco Apr. 18, 2007, no pet.) (mem. op).[14] Those cases conclude that in a suit involving breach and

---

[14] Appellants also cited a third case, *Guffey v. Clark*, No. 05-93-00849-CV, 1997 WL 142750 (Tex. App.—Dallas Mar. 31, 1997, writ denied) (not designated for publication). Because *Guffey* was decided before January 1, 2003, and was designated "do not publish" under the rules of appellate procedure in effect at that time, it has no precedential value. *See* TEX. R. APP. P. 47.7(b). However, like *Widener* and *Ganske*,

enforcement of a settlement agreement that sought to bring an end to litigation or prevent future litigation, the attorney's fees incurred by the non-breaching party in enforcing the settlement agreement are damages for the breach because they are a foreseeable consequence of the breach. *See Widener*, 717 F. Supp. at 1217 ("Because the purpose of entering into a release is to avoid litigation, the damages a releaser suffers when the release is breached are its costs and attorneys' fees incurred in defending against the wrongfully brought action."); *Ganske*, 2007 WL 1147357, at *3 ("In an action for breach of contract, actual damages may be recovered when the loss is the 'natural, probable, and foreseeable consequence of defendant's conduct.' The prior attorney's fees are such consequences of the breach." (quoting *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981))). Those cases did not hold that benefit of the bargain cannot be an appropriate measure of damages for breach of a settlement agreement. Appellants cite no cases concluding that Holdings' damages could not be measured by the benefit of the bargain.

Appellants also contend the trial court erred by submitting the jury question based on the benefit-of-the-bargain measure because there was no evidence of that measure of damages. Appellants did not object to the jury charge on that ground. Accordingly, they have waived any error on that ground. *See* TEX. R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.").

We conclude appellants have not shown the trial court abused its discretion. We overrule appellants' tenth issue.

---

it also does not conclude that benefit of the bargain cannot be an appropriate measure of damages for breach of a settlement agreement. *Guffey*, 1997 WL 142750 at *3–4.

# ATTORNEY'S FEES

In their eleventh, twelfth, and thirteenth issues, appellants contend the trial court abused its discretion by awarding Holdings its attorney's fees against SFS 23. In Texas, attorney's fees are not recoverable from an opposing party unless authorized by statute or contract. *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013).

In the eleventh issue, appellants contend Holdings is not entitled to attorney's fees against SFS 23 because Holdings did not establish the elements for a permanent injunction against SFS 23. This issue depends upon our sustaining appellants' sixth through ninth issues. However, because we overruled those issues and concluded Holdings established the elements for a permanent injunction against SFS 23, we overrule appellants' eleventh issue.

In the twelfth and thirteenth issues, appellants contend the trial court erred by awarding attorney's fees against SFS 23 "because the permanent injunction against [SFS 23] must be reversed," "the jury failed to find damages [against SFS 23]," and Holdings "failed to plead and prove SFS 23 was jointly and severally liable." We have overruled appellants' issues challenging the enforceability of the injunction. The arguments about the jury failing to find damages against SFS 23 concern appellants' argument that Holdings is not entitled to attorney's fees under section 38.001 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015). However, we need not consider those arguments because the Agreement provided for attorney's fees.

The Agreement contained a paragraph describing the procedures for any future litigation related to the Agreement. It stated that any dispute, claim, or controversy concerning breach or enforcement of the Agreement would be resolved through arbitration in Dallas. The paragraph described the method for selecting the panel of arbitrators and then described the method of allocating costs and attorney's fees incurred in the litigation:

> The substantially non-prevailing party (as determined by the arbitration panel after determining the relative success of the parties, including the successful assertion of any defense) shall bear any fees and expenses of the arbitrators, other tribunal fees and expenses, reasonable attorneys' fees of both parties, any costs of producing witnesses and any other reasonable costs or expenses incurred by him or the substantially prevailing party.

Because neither side demanded arbitration, the parties waived their right to have the dispute determined by an arbitration panel, and the parties elected to proceed in traditional litigation before a trial court and jury. Regardless of whether the adjudicator was an arbitration panel or a trial court, it appears the intent of the parties as expressed in the Agreement was that the "substantially non-prevailing party" pay the substantially prevailing party's attorney's fees. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument.").

In this case, Holdings was clearly the substantially prevailing party against both appellants. Although Holdings did not recover any damages from SFS 23 and only minimal damages from Leibovitz, Holdings obtained a permanent injunction against both Leibovitz and SFS 23 to enforce the provisions of the Agreement prohibiting appellants from filing claims against and disparaging other parties to the Agreement, including contacting the investors in other Sequoia investments and making derogatory allegations about Holdings. We conclude appellants have not shown the trial court erred by awarding Holdings its attorney's fees against SFS 23. We overrule appellants' twelfth and thirteenth issues.

## CONCLUSION

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

140125F.P05

–33–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JEFFREY LEIBOVITZ AND SEQUOIA
FRANKFORD SPRINGS 23, L.P.,
Appellants

No. 05-14-00125-CV        V.

SEQUOIA REAL ESTATE HOLDINGS,
L.P., Appellee

On Appeal from the 116th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-14357-F.
Opinion delivered by Justice Myers. Justices
Evans and O'Neill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee SEQUOIA REAL ESTATE HOLDINGS, L.P. recover its costs of this appeal from appellants JEFFREY LEIBOVITZ AND SEQUOIA FRANKFORD SPRINGS 23, L.P.

Judgment entered this 29th day of May, 2015.