

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00007-CV

_____

KAY SCHWENDEMAN, Appellant

V.

BT SFRL I, LLC, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-297695-18

Before Gabriel, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Kay Schwendeman appeals the judgment of the trial court in favor of Appellee BT SFRL I, LLC (BT) in this boundary line dispute involving an encroachment area, a fence, and a Boundary Line Agreement (BLA) between Lot 7 and Lot 8 in the City of Grapevine. In six issues, Schwendeman argues that the evidence is legally and factually insufficient to support the judgment that (1) the BLA is a valid and enforceable agreement/covenant running with the land and that a valid implied easement was created in favor of BT; (2) an implied easement for the exclusive, free, and uninhibited use of Lot 8 and/or its tenants encompasses the encroachment area; (3) BT has the sole right and responsibility to maintain, repair, and/or replace the fence; (4) imposes a permanent injunction on Schwendeman; and awards (5) damages and (6) attorney's fees. We disagree and affirm the trial court's judgment.

## II. BACKGROUND

By separate deeds dated April 8, 2004, Dee Jae Janes purchased Lot 7 (525 Estill) and Lot 8 (210–14 Austin) in the City of Grapevine, Texas. A single family residence was on Lot 7, and a four-plex apartment complex was on Lot 8. At the time the lots were purchased, a fence which Janes believed "probably was right on the property line" existed between the two lots. During her ownership of the properties, Janes moved the wooden fence from the property line onto Lot 7.

At trial, Janes explained the reasons for moving the fence. Janes testified that, after buying the properties, she had the fire department come to the apartment complex to make sure that everything was safe. According to Janes,

> And he said everything is fine with this. . . . But he said the people - - if you have a fire, he said, the people that are trying to get out with this fence right here are going to have to shimmy through to get out to the other ways.
>
> So because of that I decided that - - you know, that was again another reason why I said I have got to have the property next door and I have got to move the fence.
>
> So from my standpoint if you're going to have to buy a building that is going to be rented to tenants, it has to be safe, it has to have a good environment, and it has to be a place where people can enjoy and can accomplish the things that they are entitled to when they come to rent.

She also moved it "because the people at the end unit had a daycare, and the children were now playing in the street." However, the main reason Janes moved the fence was "that I wanted to provide a place for the children to be in the back yard. . . . and I wanted to provide a better environment in case of fire for safety."

She moved the fence "since the time I have owned that property basically, maybe a week or so difference." From the time that she moved the fence, the area between the tenants' back door and the fence was being used "for children to play, for the barbecue pit, and for fire safety for that entire time." By moving the fence, it was her intention that the property on Lot 8 would have the use of the encroaching four and a half feet from Lot 7.

3

On September 15, 2006, Janes sold Lot 7 to Stacy Mooney.[1]  On the same day, Janes and Mooney entered into the BLA.  Janes does not recall who drafted the BLA, which does not use the word "easement."  After setting out the owners and property descriptions of Lots 7 and 8, the BLA provides in part,

> The following improvements (the "Improvements") extend beyond the boundary line of Tract A [Lot 8] onto Tract B [Lot 7] in the following respects:
>
> Wood Fence encroaches onto Lot 7.
>
> In consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:
>
> 1.      The common boundary line between Tract A [Lot 8] and Tract B [Lot 7] is and shall remain the platted lot line shown on the recorded plat of said subdivision (and also is shown on the survey by J.T. Thompson (PLS#4604), dated 9/12/2006, job number 206-4563, attached hereto as Exhibit "A"), despite the encroachment of the Improvements. [Janes] hereby quitclaims to [Mooney] whatever title [Janes] may have in and to [Lot 7] arising as a result of the encroachment of the Improvements onto [Lot 7].
>
> 2.      The encroachment of the Improvements shall in no way operate or be construed to create any adverse possession for or against the owners on either side of said platted common boundary line.
>
> 3.      [Mooney] consents to the encroachment of the Improvements and shall not take any action, legal or equitable, to remove the Improvements or alter said platted and surveyed common boundary line between [Lot 8] and [Lot 7].

---

[1]At the time of trial, Mooney was known as Stacy Mooney Kempka.

4

4. This agreement shall be a covenant running with the land and shall be binding upon the undersigned, their heirs, administrators, successors[,] and assigns.

The BLA was entered as part of the same transaction as the conveyance of Lot 7, signed by both Janes and Mooney, and filed for record on September 18, 2006. Janes testified that she would not have sold Lot 7 to Mooney or anybody unless they had agreed to the BLA. However, Mooney stated that she received no consideration for signing the BLA.

Mooney testified that she also thought that allowing the four-plex tenants to use the encroachment area on Lot 7 to exit the building in case of fire was a valid reason for the location of the fence. Through at least November 17, 2010, Janes averred that she maintained the fence at her own expense by painting and fixing panels. However, Mooney stated "[t]hat [the] fence was never painted." Mooney added that she did not take care of the fence because she felt that it did not need any maintenance. According to Mooney, when she sold the property, the fence was "pretty much rotted." During her ownership, Mooney paid the taxes on the land in the disputed area.

The property remained in the name of Mooney until her mother-in-law, Schwendeman, purchased the property on December 15, 2017. For about a year and a half prior to her purchase, Schwendeman visited her daughter-in-law at the property. When Schwendeman visited the property, Mooney told her that the fence was approximately four and a half to five feet off the boundary line into Lot 7. According

5

to her testimony, when she purchased the property, Schwendeman was aware of the existence of the BLA. She was not, however, aware that the tenants on Lot 8 were using a portion of Lot 7 as their backyard.

The title commitment issued in connection with the sale of Lot 7 to Schwendeman lists the BLA as an exception on Schedule B. In addition, Schwendeman had a land survey of Lot 7 prepared which showed the BLA. Schwendeman testified that she "knew that the fence was on Lot 7 entirely and not situated right on the boundary line between [Lot] 7 and [Lot] 8." At the time of trial, Schwendeman wanted to replace the fence and relocate it to the property line.

Pursuant to requests for admissions, which were read into evidence at trial, Schwendeman admitted the following:

- Prior to the purchase of Lot 7, a title search of said property indicated a prior boundary line agreement had been signed by Lot 7's previous owner;

- She knew of the boundary line agreement signed by the predecessor in interest or owner of Lot 7 and Lot 8;

- Since her purchase of Lot 7, neither she nor her representative have had the property appraised;

- Prior to her purchase of Lot 7, she personally visited the lot;

- Prior to her purchase of Lot 7, she was aware that the disputed fence was located where it is currently located;

- She purchased Lot 7 with knowledge of where the disputed fence was located; and

6

- The relocation of the fence was not a condition to her closing with Lot 7's seller.

BT acquired Lot 8 on October 26, 2015. Thereafter, it received a letter dated January 8, 2018, from Schwendeman's attorney stating that Schwendeman "is aware that the common fence between the properties does not follow the surveyed lot lines[] and intends to remove the existing fence and replace the fence along the proper lot line." In addition, on January 30, 2018, Schwendeman sent an email containing a photograph to her attorney, which was forwarded to BT's attorney, that stated,

> This will be the back of the fence. Please tell the owner of the building next door to get his tenants to remove all of the play stuff, flagstone[,] and lawn equipment from my property this weekend. The fence guys will be tearing down and installing next week[.] Picture is back of fence. It is a 6 foot fence with cap[.]

In the email, Schwendeman's attorney added, "My client will have the fence moved as she intends."

In response to Schwendeman's email, on February 1, 2018, BT filed its "Plaintiff's Verified Original Petition for Declaratory Judgment, Application for Injunctive Relief, and Temporary Restraining Order." The trial court entered a temporary restraining order and later a temporary injunction restraining Schwendeman from damaging, moving, or relocating any portion of the wooden fence referenced in the BLA. Schwendeman answered and counterclaimed for declaratory relief, trespass, private nuisance, and attorney's fees.

After the lawsuit was filed, Schwendeman put up a fence on the property line that blocked the access out of the backyard of the four-plex. In building the new fence, she did not remove any part of the disputed fence that is subject to the BLA.

According to the manager for BT, as a result of the fence dispute, two tenants failed to renew, and one tenant moved out of the four-plex during the course of the dispute. In an email with one of the tenants who did not renew, the tenant stated,

> So what I understand is that the neighbor is currently violating the law correct? I just do not understand how the city can not force them to take that portion of the fence down immediately. One of the problems is that if I do not renew my lease I will have to move out by [M]ay[,] and there is furniture that I can not fit through the front door (that was brought in through the back door)[,] and I can not move my things out. What happens in that case?

BT's manager testified that it took over sixty days to relet the space, which rented for $1,175 a month.

> In addition, the manager for BT testified,
>
> We have a gate on each side of the property so that tenants can go in and out of the backyard. There was a fence that was constructed by the neighbor that blocked the access to the entrance and edge of the gate.
>
> . . .
>
> I put up a fence on the other side - - or, rather, put up a gate on the other side of the fence because, to me, I felt like it was a safety issue. . . .The tenants weren't able to get in and out of the backyard if it was needed, definitely in case of an emergency. I thought it was . . . a big safety issue, so I rushed to put in two gates.

He stated that the new gates were installed at a cost of $350 per gate.

8

Further, he testified that if the BLA was not observed and the disputed fence was removed and replaced on the property line, it would damage the tenants and BT. In his testimony, he added,

> [I]f there was a fire and they had to jump off the second floor, or they were already outside of the patio - - to actually be able to get out of the backyard, the reason being that between each unit the air condenser unit is back there that separates each unit. So there's a fan blower - - there's a fan blade back there. So, God forbid, if the front door wasn't able to be used, they would have to get out somewhere, the back door would be the only option; they would have to hop over - - or hurdle over - - a 4 - - a 3 ½ - ton condenser with a blade spinning if it was summertime and it was on. The unit would be hot; they could be burned . . . .

Trial was to the bench. At the time of trial, BT offered evidence that its attorney's fees were $32,927 through trial, $50,000 through any appeal to the Court of Appeals, $50,000 if a petition for review was filed with the Texas Supreme Court, and an additional $30,000 if review was granted by the Texas Supreme Court.

On December 12, 2018, the trial court entered its final judgment in favor of BT against Schwendeman, ordering that

- a declaratory judgment is entered that the BLA is a "valid and enforceable agreement/restrictive covenant which runs with the land referred to [as Lot 7 and Lot 8]."

- a valid implied easement was created and exists in favor of Lot 8 as against Lot 7 "for the exclusive use by the owner of Lot 8 and its successors-in-interest (and/or their Tenants), which easement encompasses all the area between (a) the current platted boundary line between Lot 7 and Lot 8, and (b) the location of the Wooden Fence as shown on the [BLA]."

9

- BT and its successors-in-interest and/or their tenants have the right to the free and uninhibited use of the implied easement.

- BT and its successors-in-interest have the sole right and responsibility to maintain, repair, and/or replace the fence.

- Schwendeman is "permanently enjoined and restrained from directly, or indirectly through others, committing, performing, or allowing others to commit or perform, any of the following acts: 1. Damaging, tampering with, removing[,] or relocating any portion of the Wooden Fence . . . 2. Using, occupying, taking possession of, obstructing, impeding[,] or blocking access to, damaging[,] or interfering in any way with the use or enjoyment by [BT] or its successors-in-interest[] of the area, or any part thereof, between the platted boundary line of Lots 7 and 8, and the Wooden Fence . . . ."

- BT recovers damages in the sum of $500.

- BT recovers attorney's fees in the sum of $32,927 through trial, $50,000 in the event of an unsuccessful appeal by Schwendeman to the Court of Appeals, $30,000 in the event of an unsuccessful petition for review by Schwendeman to the Supreme Court of Texas, and $20,000 in the event of an unsuccessful appeal to the Supreme Court of Texas after the granting of a petition for review.

The trial court made no findings of fact or conclusions of law. Schwendeman appeals from the judgment.

## III. DISCUSSION

### A. STANDARD OF REVIEW

In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may

10

challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.*; *Liberty Mut. Ins. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011); *see also Liberty Mut.*, 295 S.W.3d at 777.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

11

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside, and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. APPLICATION OF LAW TO FACTS

In her six issues, Schwendeman argues:

- The judgment of the trial court that the BLA is a valid and enforceable agreement/covenant running with the land and that a valid implied easement was created in favor of BT is legally and factually insufficient.

- The conclusion of law[2] and judgment that an implied easement for the exclusive, free, and uninhibited use of Lot 8 and/or its tenants encompassing the encroachment area is legally and factually insufficient and manifestly unjust.

- The judgment that BT has the sole right and responsibility to maintain, repair, and/or replace the wooden fence is legally and factually insufficient and manifestly unjust.

---

[2]At oral argument, Schwendeman conceded that no findings of fact or conclusions of law were entered by the trial court. While an initial request for findings of fact and conclusions of law was filed on October 25, 2018, Schwendeman did not file a notice of past due findings. *See* Tex. R. Civ. P. 297. A party that does not file a notice of past due findings of fact waives the right to complain that the trial court did not file findings. *AD Villarai, LLC v. Chan IL Pak*, 519 S.W.3d 132, 137 (Tex. 2017).

- The imposition of a permanent injunction on Schwendeman is an abuse of discretion by the trial court and legally and factually insufficient.

- The trial court's judgment of damages of $500 against Schwendeman in favor of BT is legally and factually insufficient.

- The judgment awarding attorney's fees to BT, including attorney's fees for appeals, is legally and factually insufficient.

**1. Whether or not there is a license is not relevant as to whether an easement was created.**

As part of her first issue, Schwendeman argues that, by moving the fence, Janes created only a "license to her tenants on Lot 8 and not an easement." Being only a license, she contends that it was "revocable at the will of the licensor." BT responds that this argument may not be argued for the first time on appeal.

Schwendeman's counsel only briefly mentioned a license in his motion for judgment to the trial court. At trial, he argued, "The best -- The -- best that that boundary line agreement is -- and I'm not saying that -- that it even does this -- is nothing more than a license." In her reply brief and at oral argument, Schwendeman's counsel argued that a general denial was sufficient to place all matters, including whether the BLA was a license, into dispute.[3] While we agree that a party must first

---

[3]While we do not decide if a general denial is sufficient to raise the issue of license, we note that the supreme court has disapproved language from *Stone Resources, Inv. v. Barnett*, 661 S.W.2d 148 (Tex. App.—Houston [1st Dist.] 1983, no writ) which placed the burden on the defendant to plead and prove consent or license. *Envtl. Processing Systems, L.C. v. FPL Farming, Inc.*, 457 S.W.3d 414, 423 (Tex. 2015).

present its arguments or objections to the trial court and the trial court must rule on them or the party must object to the trial court's failure to rule, Tex. R. App. P. 33.1(a), whether or not a license existed is not relevant as to whether an easement was created. *See Crone v. Brumley*, 219 S.W.3d 65, 68 (Tex. App.—San Antonio 2006, pet. denied) (citing *Bains v. Parker*, 182 S.W.2d 397, 399 (1944)) (stating that "an easement by necessity is not defeated by proof that the party seeking the easement has 'a mere license to use a way across the land' of another"). Therefore, rather than addressing whether or not a license existed, we will instead address whether the BLA was a restrictive covenant binding on Schwendeman (and enforceable by injunction) and whether an implied easement was created over the encroachment area.

## 2. The BLA is a restrictive covenant running with the land.

Schwendeman argues that the BLA "does not satisfy the statute of frauds or the statute of conveyance" and "does not convert the created license into an easement." *See* Tex. Bus. & Comm. Code Ann. § 26.01(b)(6); Tex. Prop. Code Ann. § 5.021. In its brief, BT concedes that it "never contended that the BLA purported to convey real estate or an estate therein." Rather, as argued by BT, "It was merely an agreement running with the land that [Schwendeman] anticipatorily violated when she stated her intention to remove the existing fence and build a new fence on the boundary line between Lots 7 and 8[,]" and it was "a valid restrictive covenant to which the parties were bound immediately upon execution."

14

"A 'restrictive covenant' is a negative covenant that limits permissible uses of land. Such covenants limit the use an owner or occupier of land can make of their property." *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 279 (Tex. 2018) (citations omitted). A covenant runs with the land when it touches and concerns the land; relates to a thing in existence or specifically binds the parties and their assigns; is intended by the original parties to run with the land; and when the successor to the burden has notice. *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Purchasers with constructive notice of restrictive covenants, as well as items in the chain of title, are bound by them. *Id.*

Here, the BLA satisfies the requirements of a covenant running with the land. It clearly touches and concerns the land because the document itself references both Lot 7, Lot 8, and the fence that "encroaches onto Lot 7." Further, it expressly states that it is "a covenant running with the land." It relates to a thing in existence (the fence) and specifically was "binding upon the undersigned, their heirs, administrators, successors[,] and assigns." It was signed by Janes and Mooney and was filed for record in order to give all successors constructive notice. In addition to actual notice based on her visits and conversations with Mooney prior to her purchase, Schwendeman had notice of the BLA on the title commitment she received at closing as well as the land survey that she had prepared. The BLA is clear evidence of Janes' intent, in conjunction with the years of prior use by her tenants on Lot 8, to

15

permanently deprive Lot 7 of the use of the encroachment area bounded by the relocated fence.

While Schwendeman argues that the BLA was not supported by consideration, the sale of Lot 7 to Mooney was part of the same transaction as the BLA. *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). In addition, Janes testified that the sale of Lot 7 would not have occurred without the BLA. The general rule is that separate instruments or contracts, executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. *Id.*; *see also Vista Dev. Joint Venture II v. Pac. Mut. Life Ins. Co.*, 822 S.W.2d 305, 307 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (applying rule to promissory note and deed of trust). Therefore, the BLA is supported by the same consideration that supported the sale of Lot 7 to Mooney. *See also Tarr*, 556 S.W.3d at 279–80 (stating that "when land is sold, the agreed-to covenants enter[ ] into and become[ ] a part of the consideration" (internal citations omitted)). Having satisfied the requirements of a restrictive covenant running with the land, the BLA was binding on Schwendeman. We overrule the first issue.

**3. There is legally and factually sufficient evidence to support that an implied easement by estoppel exists and that BT has the responsibility to maintain, repair, and/or replace the fence.**

BT argues that it was entitled to declaratory judgment that an implied easement, either by prior use and/or estoppel, exists on Lot 7 in favor of Lot 8. While Schwendeman generally challenges the conclusion that an implied easement

16

existed, she failed to argue that the judgment could not be upheld on the theory of implied easement by estoppel.[4]  In the absence of findings and conclusions by the trial court, the judgment can be upheld on this ground alone.  *Lassiter v. Bliss*, 559 S.W.2d 353, 358 (Tex. 1977), *overruled on other grounds by Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768 (Tex. 1989) ("Where findings of fact and conclusions of law are not properly requested and none are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence.").

An easement is a nonpossessory interest that authorizes its holder to use the property of another for only particular purposes.  *Killam Ranch Props., Ltd. v. Webb Cty.*, 376 S.W.3d 146, 155 (Tex. App.—San Antonio 2012, pet. denied) (citing *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002)).  Typically, easements must be in writing.  *Erwin v. Ferris*, No. 12-10-00273-CV, 2011 WL 2638812, at *7 (Tex. App.—Tyler June 30, 2011, pet. denied) (mem. op.).  However, an easement by estoppel is an exception to the statutes requiring that the conveyance of an interest in land be in writing.  *Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979).

Under the doctrine of easement by estoppel, the owner of the alleged servient estate may be estopped from denying the existence of an easement if she made representations that were acted upon by the owner of the alleged dominant estate. The three elements required to create an easement by estoppel are (1) a representation

---

[4]In her reply brief, Schwendeman does respond to BT's argument that the judgment can be upheld on this theory.

17

of the easement communicated, either by words or action, to the promisee; (2) the communication was believed; and (3) the promisee relied upon the communication. *Gordon v. Demmon*, No. 07-17-00133-CV, 2019 WL 1782013, at \*5 (Tex. App.—Amarillo April 23, 2019, pet. denied) (mem. op.) (citing *Storms*, 579 S.W.2d at 452). These elements apply at the time the communication creating the alleged easement is made. *Holden v. Weidenfeller*, 929 S.W.2d 124, 131 (Tex. App.—San Antonio 1996, writ denied). Once created, it is binding upon the owner of the servient estate and his successors in interest if they had notice—actual or constructive—of the easement claimed. *Robinson v. Riddick*, No. 04-15-00272-CV, 2016 WL 1238166, at \*3 (Tex. App.—San Antonio Mar. 30, 2016, no pet.) (mem. op.). It is also binding if the owner of the dominant estate and her successors in interest continue to rely upon the existence of the easement. *Id.*

Here, it is undisputed that Mooney knew not only that the fence had been placed on Lot 7, but also the reason for its placement. Both Janes and Mooney signed the BLA which set out the terms of the encroachment. Mooney knew and agreed that allowing the four-plex tenants to use the encroachment area on Lot 7 to exit the building in case of fire was a valid reason for the location of the fence. In selling Lot 7 to Mooney, Janes relied upon the representation that the fence would remain in place. *See Holden*, 929 S.W.2d at 132 (upholding a finding of easement by estoppel where behavior of the owner of the servient estate indicated that there was no objection to the dominant estate's use of the servient estate for ingress and egress).

18

While Janes maintained the fence until she sold Lot 8, Mooney paid the property taxes on the encroachment area on Lot 7.

Schwendeman had both actual and constructive knowledge of the easement. Prior to her purchase, Schwendeman visited her daughter-in-law Mooney, who told her that that the fence was approximately four-and-a-half to five feet off the boundary line into Lot 7. In addition, the title commitment issued in connection with the sale of Lot 7 to Schwendeman listed the BLA as an exception on Schedule B, and the land survey of Lot 7 showed the BLA. Relying on the representation, Schwendeman bought Lot 7 with actual and constructive notice of the BLA and the encroachment of the fence.

BT presented evidence that it expended funds in reliance on the representation that its tenants could use the disputed land. After the purchase of Lot 7 by Schwendeman, the owners of Lot 8 continued to rely upon the BLA for its tenants to use the disputed parcel and fence to access their units. When Schwendeman installed a new fence on the surveyed lot line, BT was forced to install two gates in the fence in order to give its tenants access to their units. *See LaTaste Enters. v. City of Addison*, 115 S.W.3d 730, 736–37 (Tex. App.—Dallas 2003, pet. denied) (noting that reliance can be shown by expending funds to improve the dominant estate). We conclude that BT established that there was an implied easement by estoppel and that it has the right to the use of the implied easement as well as the responsibility to maintain,

19

repair, and/or replace the fence. Accordingly, we overrule the second and third issues.

### 4. There is legally and factually sufficient evidence to support the injunction.

A judgment denying or granting a permanent injunction is reviewed for clear abuse of discretion. *Jamestown Partners v. City of Fort Worth*, 83 S.W.3d 376, 384 (Tex. App.—Fort Worth 2002, pet. denied). To obtain a permanent injunction, a party must show (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 350–51 (Tex. App.—Dallas 2015, no pet.). Imminent harm is established by showing that the appellant will engage in the activity sought to be enjoined. *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no pet.). An injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard. *Leibovitz*, 465 S.W.3d at 353.

Despite knowledge of the BLA and the use of the encroachment area, Schwendeman stated her intention—before the lawsuit was filed—to remove the existing fence and place it on the property line. After the lawsuit was filed, Schwendeman proceeded to put up a fence on the property line that blocked the backyard access of the tenants of the four-plex. Even at the time of trial, Schwendeman wanted to replace the fence and relocate it to the property line. A representative of BT testified that, as a result of the fence dispute, two tenants failed

20

to renew, and one tenant moved out of the four-plex. The evidence showed a wrongful act that threatened imminent harm and irreparable injury because the BLA would no longer be effective. Therefore, we conclude that the trial court did not abuse its discretion in granting the permanent injunction against Schwendeman and her successors or heirs to prevent them from using, occupying, taking possession of, obstructing, damaging, or interfering in any way with the use of the encroachment area. Accordingly, we overrule the fourth issue.

### 5. There is legally and factually sufficient evidence to support the award of damages.

In its judgment, the trial court awarded damages of $500. At trial, the manager for BT testified that, due to the fence dispute, two tenants failed to renew, and one tenant moved out of the four-plex, which rented for $1,175 a month. He further averred that it took sixty days to relet the space. In addition to the cost of the vacancies, he testified that after the temporary injunction was granted, Schwendeman built a fence on Lot 7 which blocked two of the gates on Lot 8. Therefore, BT had to install two gates in the fence, at a cost of $350 per gate. Based on this evidence, we conclude that there is legally and factually sufficient evidence to support the award of $500 in damages. Therefore, we overrule the fifth issue.

### 6. There is legally and factually sufficient evidence to support the award of attorney's fees.

In one paragraph and with no citation to authority, Schwendeman argues, "Because the trial court erred in its judgment for [BT], its judgment awarding

21

attorney['s] fees to [BT] including additional fees for appeals, is likewise error and should be reversed." We disagree.

We review a trial court's award of attorney's fees in a declaratory judgment action for an abuse of discretion. *See Amaro v. Wilson Cty.*, 398 S.W.3d 780, 789 (Tex. App.—San Antonio 2011, no pet.). In a proceeding under the Uniform Declaratory Judgments Act ("the UDJA"), Section 37.009 of the Texas Civil Practice and Remedies Code authorizes the trial court, in its discretion, to award reasonable and necessary attorney's fees it deems equitable and just.[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.001. "The UDJA allows a party to seek a declaration of rights, status, or other legal relations under a deed, will, written contract, or other writings." *Roberson v. City of Austin*, 157 S.W.3d 130, 135 (Tex. App.—Austin 2005, no pet.). The UDJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

---

[5]BT also relies upon Section 5.006(a) of the Texas Property Code to support the award of attorney's fees. It provides, "In an action based upon breach of a restrictive covenant pertaining to real property, the court shall allow a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." Tex. Prop. Code Ann. § 5.006(a). BT argues that Schwendeman "anticipatorily breached the BLA as a restrictive covenant that is the subject of this suit by unequivocally threatening to move the wooden fence to the boundary line between Lots 7 and 8 in violation of the BLA." Because we conclude that attorney's fees are recoverable under the UDJA, we do not address whether they are also recoverable under Texas Property Code Section 5.006.

22

To secure an award of attorney's fees in a fee-shifting situation, the prevailing party must prove that: (1) recovery of attorney's fees is legally authorized, and (2) the requested attorney's fees are reasonable and necessary for the legal representation, so that the award will compensate the prevailing party generally for its losses resulting from the litigation process. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (2019). When fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees. *Id.* at 484.

The starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts. *Id.* at 498. Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Id.* Contemporaneous billing records, although not required, are strongly encouraged to prove the reasonableness and necessity of requested fees when those elements are contested. *Id.* at 502.

Here, BT sought a declaration of its rights pursuant to the BLA. It offered testimony of its attorney's fees through its attorney George A. "Tony" Mallers, who testified to his background and the "reasonable and necessary" billing rates of the

23

attorneys and paralegal who worked on this case. Further, his thirty-two pages of billing records detailing the dates, amounts and description of services rendered were admitted into evidence. Mallers testified that the billing records reflected tasks that were "necessary to the prosecution of the declaratory judgment action." We conclude that there is legally and factually sufficient evidence to support the award of attorney's fees. Thus, we overrule the sixth issue.

## IV. CONCLUSION

Having overruled all six issues, we affirm the trial court's judgment.


/s/ Dana Womack

Dana Womack
Justice

Delivered: January 30, 2020