**AFFIRMED and Opinion Filed February 8, 2023**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-20-00611-CV
_____

**THE CITY OF DALLAS, Appellant**
**V.**
**MILLWEE-JACKSON JOINT VENTURE AND STEPHEN M. MILLWEE, Appellees**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-04-07287-D**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Goldstein, and Smith
Opinion by Justice Pedersen, III

This is the third appeal in a long-running dispute between the City of Dallas

and landowners Millwee-Jackson Joint Venture and Stephen M. Millwee (together,

Millwee) concerning whether the City—through its own development—has

foreclosed development of Millwee's land (the Property). The trial court concluded

that the City had done so and signed a judgment that allowed the City to choose

between reopening and maintaining a street it had abandoned and compensating

Millwee for the taking of his property rights caused by the street closure. In this

Court, the City challenges (1) the trial court's subject matter jurisdiction to enter

such an injunction, (2) the legal basis for the injunction, and (3) a declaratory judgment concluding that the boundaries drawn in a 2001 FEMA 100-year floodplain apply to the Property. In his cross-appeal, Millwee argues the trial court erroneously denied his claim for inverse condemnation based on a regulatory taking of his Property by the City. We affirm the trial court's judgment.

## BACKGROUND

In 1981, Millwee purchased the Property from Chicago Rock Island and Pacific Railroad Company when the railroad was in bankruptcy. The tract contained approximately 2.5 acres, and was bordered in part by Interstate 35, the City-owned Stemmons Park, and railroad property; Turtle Creek lies between the Property and the park to the west. An easement from the railroad allowed Millwee access to the Property, running under the nearby railroad bridge to the east and connecting with Alamo Street. A portion of the Property lies in the 100-year floodplain, including that original easement. The only structures on the Property since its purchase have been billboards.

When Millwee purchased the Property, Alamo Street ran south from Oak Lawn Avenue down through Stemmons Park, continued under the railroad tracks, and then came back toward the south, extending all the way to downtown at the Woodall Rogers Freeway. Alamo Street was an open public street for at least thirty years. It carried a significant amount of traffic and, up until 2002, evidence suggested

that it was well maintained by the City. Surveys performed by the City before and after Millwee's purchase establish that his Property abutted Alamo Street.

Millwee always planned to develop the Property commercially beyond its use for billboards; he planned to build a hotel or an office building on the site. City regulations required such a development to have two access points for safety considerations. Millwee's efforts to create that second access underlie many of his dealings with the City over the years and most of the issues in this litigation.

Relatively early in the process, the parties appear to have agreed that the only plausible solution for a second access was to build a bridge from Millwee's Property over Turtle Creek to Alamo Street, which in turn connected to Oak Lawn Avenue. Millwee sought approval from the City to build such a bridge. In 1983, Millwee submitted his Final Plat of the Property to the City. The plat showed the location of his Property, the 100-year floodplain line, detailed water and sewer plans, and the proposed bridge. The plat also included a note that stated:

> EXISTING ACCESS IS PROVDED BY DEED FROM THE RAIL ROAD COMPANY UNDER THE EXISTING BRIDGE. THE CITY OF DALLAS PUBLIC WORKS DEPARTMENT WILL REVIEW ANY PLANS FOR ADDITION[AL] ACCESS UPON FURTHER DEVELOPMENT.

There is no question that planning for the bridge continued between the parties. In February 1985, the City sent Millwee a letter that stated the City had held an interdepartmental meeting and identified the actions required for development of

the Property. The letter set forth the responsibilities of each party to achieve that goal:

> City Responsibilities:
>
> 1. Dedicate a 56 foot right-of-way for Alamo Street from the north addition line of the Millwee/Jackson Addition to Oak Lawn Avenue;
>
> 2. Abandon those portions of the existing Alamo Street right-of-way no longer necessary for street purposes;
>
> 3. Establish a new alignment for Alamo Street;
>
> 4. Prepare field notes for the abandonment of Alamo Street;
>
> 5. Prepare field notes for the new right-of-way of Alamo Street.
>
> Millwee/Jackson's Responsibilities:
>
> 1. Prepare engineering plans, and submit to Private Development for review and approval. Construct Alamo Street as per the approved alignment;
>
> 2. Prepare engineering plans, and submit to Private Development for review and approval. Construct the bridge over Turtle Creek. The bridge must extend through the Floodway Management Area;
>
> 3. Relocate any landscaping and irrigation system, etc., in the approved Alamo Street alignment to the satisfaction of the Park and Recreation Department; and
>
> 4. Provide an area below the new bridge for a hike/bike path. The design and location to be determined by the Park and Recreation Department.

Millwee identifies the 1985 letter as the City's "last official action" with respect to the bridge. On its face, the letter gave at least conditional permission for Millwee to construct a bridge from his property at his own expense.

Millwee began working on engineering and site preparation pursuant to his responsibilities under this 1985 plan. Unfortunately, soon after the proposal was

–4–

accepted, the economy entered a significant downturn, and development plans were placed on hold.

As development once again became a possibility in Dallas, the City agreed to amend its Thoroughfare Plan, making changes to some seventeen streets in the area of the Property, in order to advance the "Arena Project," i.e., the development of the American Airlines Center and the Victory development close by. As part of the plan, Alamo Street was to be "deleted" from the Dallas North Tollway to Oak Lawn Avenue. During this time period, the City also made an agreement with Dallas Area Rapid Transit (DART) to abandon Alamo Street next to the Property and to convey the City's right of way to DART. The agreement allowed DART to build two sets of railroad tracks and the City to construct a portion of its new roadway, Houston Street.

Beginning in 2002, Alamo Street was demolished to the east of the railroad bridge. It was barricaded and closed from that bridge west to Oak Lawn Avenue. Millwee's easement was removed.[1] Subsequent construction activities involving the railroad project—which continued through 2007—blocked access to Millwee's Property and physically occupied portions of his Property.[2]

---

[1] Millwee was given a replacement easement that it describes as a path "over a rock surface from the railroad tracks to Houston Street," requiring a vehicle coming from Houston Street "to cross private property, a closed Alamo Street and the right-of-way abandoned to DART." In addition, the easement has been blocked by vehicles in "a rock paved parking lot area" next to Houston Street.

[2] During the years Millwee owned the Property, it was also considered for a role in a number of City projects besides the railway corridor for DART, including the "Connection" to join the Katy trail to other

Millwee filed suit against the City and DART in 2004. This Court has heard two appeals in the case, initially reversing a number of summary judgments and the grant of the City's plea to the jurisdiction in *Millwee-Jackson Joint Venture v. Dallas Area Rapid Transit*, 350 S.W.3d 772, 786 (Tex. App.—Dallas 2011, no pet.) [hereinafter *Millwee I*], and three years later, affirming the trial court's denial of the City's amended plea in *City of Dallas v. Millwee–Jackson Joint Venture*, 2014 WL 1413559, No. 05–13–00278–CV (Tex. App.—Dallas, April 4, 2014, pet. denied) (mem. op.) [hereinafter *Millwee II*]. Millwee non-suited his claims against DART in June 2017.

The case was tried in April 2019. The parties agreed to a bench trial on liability, and the Honorable David Evans conducted the trial. Millwee's live petition included claims for inverse condemnation, for a section 65.015 injunction, and for a declaratory judgment, which had earlier been granted by a partial summary judgment during the pendency of the litigation. Judge Evans issued findings of fact and conclusions of law. His judgment ordered that (1) Millwee take nothing on his inverse condemnation claim, (2) the summary judgment on Millwee's declaratory judgment claim be merged into the final judgment, and (3) Millwee was entitled to relief under his section 65.015 claim. The judgment provided the relief for that third claim as follows:

trails near downtown, "Project Pegasus" involving the widening of Stemmons Freeway, and Parks Department's efforts to expand the City's parklands.

The Court, therefore, ORDERS, ADJUDGES, DECREES, and PERMANENTLY ENJOINS the City of Dallas to open Alamo Street from Oak Lawn to Houston Street and maintain it as a public street, including at a minimum to asphalt pave Alamo Street in compliance with the City of Dallas's Public Works Construction Standards. The City of Dallas must comply with this injunction within a reasonable time.

SAFE HARBOR PROVISION. Notwithstanding the Court's permanent injunction ordered herein and pursuant to section 65.015 of the practice and remedies code, the Court further ORDERS the City of Dallas will not be in contempt of this Final Judgment, if within a reasonable time instead of opening and paving Alamo Street the City of Dallas commences a condemnation suit to ascertain the Plaintiffs' damages for the abandonment of Alamo Street as prescribed in the Texas Civil Practices and Remedies Code section 65.015.

This appeal and cross-appeal followed.

## THE CITY'S APPEAL

The City raises three issues, challenging the trial court's subject matter jurisdiction to enter a permanent injunction, the trial court's granting of the permanent injunction, and the trial court's granting of a partial summary judgment on Millwee's declaratory judgment claim. We address these issues in turn.

### The Permanent Injunction: Subject Matter Jurisdiction

In its first issue, the City argues that Millwee did not have standing to request—and the trial court did not have subject matter jurisdiction to grant—the permanent injunction. The City casts this issue as one of sufficiency of the evidence, contending that the record contains no or insufficient evidence (a) of traceability, i.e., that Millwee's alleged injury was caused by the partial closure of Alamo Street, or (b) of redressability, i.e., that the reconstruction of Alamo Street will allow

–7–

Millwee to develop his Property. While we consider relevant facts in the process, ultimately we review the question of standing de novo, because it is a component of subject matter jurisdiction. *Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 240 (Tex. 2020).

In Texas, standing to sue may be predicated on either statutory or common law. *Bickham v. Dallas Cnty.*, 612 S.W.3d 663, 669 (Tex. App.—Dallas 2020, pet. denied). The City relies upon the general common law rule stating that standing requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court. *See Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). The City argues that Millwee lacks evidence of both the traceability of his injury to the City's conduct and the redressability of his injury by the permanent injunction. *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) (comparing the Texas common law test to federal courts' Article III test for standing, which includes these two elements). Texas' common law standing rules apply in all cases absent a statute to the contrary. *Bickham*, 612 S.W.3d at 669–70. When standing is rooted in a statute, however, we construe the statute to determine upon whom the Texas Legislature conferred standing and whether the claimant falls into that category; we look to the statute itself as the framework for our standing analysis. *D.K.W. v. Source for PublicData.com, LP*, 526 S.W.3d 619, 625 (Tex. App.—Dallas 2017, pet. denied).

We note at the outset that recent pronouncements of our Texas Supreme Court have "discouraged the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit." *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 566–67 (Tex. 2021) (citing *Pike v. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020)). The court has cautioned that often, whether a plaintiff has met the requisites of a particular statute will inform that plaintiff's right to relief rather than the subject-matter jurisdiction of the court to hear the case. *Id.*; *see also Pike*, 610 S.W.3d at 773 ("[S]tanding 'is a word of many, too many, meanings.'") (quoting S*teel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998)). And rather than focusing on a right to relief under a statute, we are to begin with the understanding that a plaintiff has standing when he is personally aggrieved. *Pike*, 610 S.W.3d at 775. Our threshold inquiry, therefore is whether Millwee has been personally aggrieved.

Millwee brought his injunction claim pursuant to the Texas Civil Practice and Remedies Code section titled "Closing of Streets," which provides:

> An injunction may not be granted to stay or prevent the governing body of an incorporated city from vacating, abandoning, or closing a street or alley *except on the suit of a person*:
>
> (1) who is the owner or lessee of real property abutting the part of the street or alley vacated, abandoned, or closed; and
>
> (2) whose damages have neither been [a] ascertained and paid in a condemnation suit by the city nor [b] released.

TEX. CIV. PRAC. & REM. CODE ANN. § 65.015 (emphasis added). We begin our standing analysis, as we did in *Millwee II*, with this statute. We construe the statute to determine upon whom the Texas Legislature may have conferred standing and, if so, whether Millwee falls within that category. *See Dallas Fort Worth Intern. Airport Bd. v. Cox*, 261 S.W.3d 378, 385 (Tex. App.—Dallas 2008, no pet.). "When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis." *Bickham*, 612 S.W.3d at 669–70 (quoting *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.)).

Section 65.015 begins by stating a general rule: courts may not grant an injunction to stay or prevent an incorporated city from vacating, abandoning, or closing a street. The remainder of the section identifies the exception to this general rule, which involves the "suit of a [particular] person," i.e. a plaintiff. *See* CIV. PRAC. & REM. § 65.015. That plaintiff—who may be granted an injunction against the street-closing city—must own or lease real property that abuts the part of the street the city has vacated, abandoned, or closed. *Id.* at § 65.015(1). And that plaintiff must not have released his damages (i.e., consented to the city's action) or been compensated for them in a condemnation action. *Id.* at § 65.015(2).

Thus, section 65.015 created a claim for a plaintiff alleging an injury caused when a city closes a street that abuts the plaintiff's property, so long as the plaintiff has not released his claim for damages or been compensated by the city through a condemnation action. This is precisely Millwee's claim: he alleges he owns land

–10–

that abutted Alamo Street, which was closed by the City, causing him injury without his acquiescence or the City's compensating him. The injury Millwee claims in his Tenth Amended Petition is that "the Property cannot be developed with commercial uses without safe and reasonable access through Alamo Street to Oak Lawn Avenue and Houston Street." We do not address here whether Millwee can prove the merits of this claim; that issue does not affect the trial court's jurisdiction to hear his claim. *See Pike*, 610 S.W.3d at 777; *see also DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008) ("A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress."). We conclude that section 65.015 created standing for Millwee to urge, and subject matter jurisdiction for the trial court to hear, the injunction claim in this lawsuit.

In the interest of judicial efficiency, we briefly address the City's common law jurisdictional arguments as well. The City contends first that Millwee cannot trace his injury to the City's conduct, arguing that Millwee's inability to develop his Property was caused "not by the closure of Alamo Street but rather by his failure to get a bridge constructed over Turtle Creek and connected to Oak Lawn Avenue to provide a second access to the Property" as the City required. But in truth this argument supports Millwee's claim:  as the City states, the bridge needed to be "connected" to Oak Lawn Avenue. The "connection" was an open and operable Alamo Street. The City now declares that the relevant part of Alamo Street—i.e.,

where the planned bridge would have connected—is "open." The trial court disagreed, finding that "[t]he City wrongfully closed Alamo Street from Oak Lawn Avenue to Houston Street" and that "[t]he City has not maintained that portion of Alamo Street from Oak Lawn Avenue to Houston Street since 2002."[3] The City's attempt to point to the unbuilt bridge, without acknowledging that such a bridge could no longer effect a "connection" to Oak Lawn Avenue via an open, operable Alamo Street, is unpersuasive. As we have concluded in this case: "Without Alamo Street, the proposed bridge is nothing more than a bridge to nowhere." *Millwee II* at *14. For jurisdictional purposes, Millwee's inability to develop its Property is fairly traceable to the City's closure of Alamo Street.

Nor do we agree that there is insufficient evidence of redressability in this case. To establish this requirement, Millwee must show that there is a substantial likelihood that the injunction will remedy his alleged injury. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018). The City relies on the same evidence here as it did for the traceability factor: Millwee's inability to build the bridge across Turtle Creek. But if Alamo Street is rebuilt and maintained, Millwee can again pursue the bridge alternative or some other access point that may have become possible over the period of time that this case has existed. The City—as the

---

[3] We address the evidence underlying the City's claim and the trial court's findings below.

party challenging the court's jurisdiction—has not negated the possibility of Millwee's obtaining the access necessary to develop the Property.

We conclude that whether the issue is analyzed under statutory or common law principles, the trial court had jurisdiction to hear the injunction claim and Millwee had standing to make that claim. We overrule the City's first issue.

## The Permanent Injunction:  The Merits

In its second issue, the City challenges the trial court's granting of the permanent injunction on the merits. Specifically, the City argues that (1) Millwee has not offered evidence of a wrongful act, and (2) the trial court abused its discretion by not weighing the equities before granting injunctive relief.

We review a trial court's order granting or refusing a permanent injunction for an abuse of discretion. *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 350 (Tex. App.—Dallas 2015, no pet.). Under this standard, the legal and factual sufficiency of the evidence are not independent grounds for reversal, but the sufficiency of the evidence is a relevant factor in determining whether the trial court had sufficient evidence to exercise its discretion. *Id.* at 350–51.

### *Evidence of a Wrongful Act*

To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law. *Pike*, 610 S.W.3d at 792. The City challenges only the first of those elements, the existence of a wrongful act. The City also argues here that neither

–13–

section 65.015 nor the common law affords Millwee the right to require the City "to open Alamo Street from Oak Lawn to Houston Street and maintain it as a public street." We understand this part of the City's second issue to embrace two component questions: one evidentiary (does sufficient evidence support the finding that the City actually closed Alamo Street in its entirety?) and one legal (even if the City did completely close Alamo Street, does Millwee have a legal right to sue for injunctive relief?). With answers to those questions, we can determine whether the trial court correctly granted Millwee the permanent injunction.

(1)    <u>Did the City close Alamo Street</u>?

The only factual matter that plays a part in this issue is the City's assertion that Alamo Street is now open from Oak Lawn Avenue to the railroad tracks. The City offered testimony from two City employees that: (1) "several years" before the 2019 trial, that stretch of Alamo Street "appear[ed] to be open"; (2) that portion of Alamo Street is "a public way," which the City identifies as "a park road"; and (3) the relevant stretch is "a public street" used by DART for bridge inspections and by the City for maintaining the park, it is "open to the public through a traffic signal," and its purpose there is "to access the park."

Millwee, on the other hand, offered evidence that—at least for purposes of passage by public vehicles—Alamo Street remains a closed, unmaintained roadway. The bollards and barriers within the Alamo Street right-of-way that originally prevented cars from proceeding east beyond the DART bridge were gone by the time

–14–

of trial, but it was undisputed that the City no longer maintained the road. The City posted signs at Oak Lawn that say "Street Ends No Outlet." John Brunk, a retired transportation planner for the City, testified that Alamo Street was closed to public traffic in 2007, and the City had no plans to reopen the street between the railroad bridge and Oak Lawn after it was closed.

Millwee also offered testimony from Michael Hellman, the park planning manager for the City, who testified in his 2012 deposition that the portion of former Alamo Street between Turtle Creek and Oak Lawn Avenue was then park land, because "It [was his] understanding there is no street right-of-way there." He was not aware of any improvements to Alamo Street since 2001. And when asked to describe the current status of the pavement of Alamo Street between Oak Lawn and the DART railroad tracks he answered, "I would define it as abandoned and crumbling."

The City argues that Millwee's evidence relies on evaluations like Hellman's that were made early in the litigation. But we have identified no evidence of affirmative City conduct since 2007 that was intended either to maintain Alamo Street from Oak Lawn Avenue to the railroad bridge or to reopen that stretch of road for public traffic.

We conclude the trial court's findings determining that the City closed the entirety of Alamo Street were supported by ample evidence. The City no longer challenges the fact that Millwee's property abutted Alamo Street. And it is

undisputed that the City did not initiate a condemnation suit to ascertain and pay Millwee for damages associated with that closure; likewise, it is undisputed that Millwee has not released his claim against the City for any injury it suffered as a result of the closure. Millwee met its burden to establish the elements of section 65.015. Thus, the trial court had sufficient evidence upon which to decide the challenged element of its permanent injunction, i.e., whether the City's closure of Alamo Street was a wrongful act.

> (2) Having met the requirements of section 65.011,
> does Millwee have an injunctive remedy?

Millwee contends that section 65.011 provides him the right to an injunction after the City closed Alamo Street, because he is the owner of real property that abutted the street and his damages had not been paid in a condemnation suit or released by Millwee. The City argues that section 65.011 "does not constitute a statutory grant of a right to sue for a nonconsenting owner of abutting property to prevent the closure of a street or require the street's reopening." Statutory interpretation is a legal issue that we address de novo. *Sommers for Alabama & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017). We begin an analysis of a statute with its words and then consider the apparent meaning of those words within their context. *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014).

We look to the words of section 65.015 as they relate to our case. Initially, the statute's predicate language states a negative rule: an incorporated city may not be enjoined from closing a street. The remainder of the statute sets forth the exception to this negative rule, i.e., it identifies when an incorporated city *may* be enjoined from closing a street. The predicate rule against such an injunction applies "except on the suit of a person" who meets the section's two pronged standard. First, this person bringing suit must own land that abuts the closed street. And second, the person may not have released his claim for injury based on the closure or have had his claim redressed through a condemnation suit.

The City makes two assertions concerning the meaning of this statute. We agree with the first one: consent by the landowner is not a factor in application of this statute. However, we cannot agree with the City's second contention that this section—standing alone—is insufficient to give rise to an injunction claim to the proper plaintiff. The City argues that for a right of action under section 65.015 to exist, "an abutting landowner would have to rely on some other statute to grant him entitlement to a street closure." The plain language of the statute adds no such requirement, and we may not add mandates to a statute that the Legislature did not include. *See, e.g., City of Rockwall v. Hughes*, 246 S.W.3d 621, 631 (Tex. 2008) ("[C]hanging the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function.").

Moreover, the City's argument for requiring a second statutory ground to trigger entitlement to a section-65.015 injunction is based upon a faulty reading of *Dykes v. City of Houston*, 406 S.W.2d 176 (Tex. 1966). The City argues that *Dykes* required independent acquisition of a "private easement" by the landowner before it applied section 65.015's predecessor, article 4646a. We disagree. The discussion of private easement right in *Dykes* was based on the city's failure to open a street abutting Dykes's property, although the street had been shown on a plat of the property when the land was purchased. 406 S.W.2d at 178. Dykes asked the City Council to clear the wooded area and to open a street at that point, but he was unsuccessful; his efforts at self-help also failed.[4] The city acknowledged "that it did not, before erecting a barricade, comply with the provisions of Article 4646a, which requires that where the rights of abutting owners are involved, the City must, before vacating, abandoning, or closing a street, obtain a release or condemn the property to be effected." *Id.* at 179–80 (footnote setting forth text of Article 4646a—

---

[4] The opinion described Dykes's efforts to open the street:

He went before the Council a number of times requesting such action by the City; hearings were held and witnesses were heard, but the City, within its discretion, refused to open the street. Dykes, having failed in his appeal to the City, then hired a bulldozer and began clearing the land of trees and underbrush and grading it himself. Thereafter, on August 5, 1962, the City erected a wooden barricade deemed necessary to prevent traffic from proceeding into this area while under the impression that it was a continuation of the paved street itself and safe for travel. This barricade was burned by Mr. Dykes. The City then erected a metal barricade which Mr. Dykes, on May 22, 1964, attempted to dismantle with a blowtorch. He was restrained by the police from accomplishing his purpose on this occasion.

406 S.W.2d at 179.

substantively identical at section 1 to section 65.015—omitted). The city argued it was not bound to comply with Article 4646a because it was not attempting to close the street; the street had never been opened. *Id.* at 180. The supreme court concluded that "when the plaintiffs purchased their lots with reference to the subdivision plat, they immediately acquired private rights of easement over the streets shown on such plat as abutting their land whether or not such streets were ever accepted or opened by the City, as representative of the public." *Id.* at 181.

Subsequent cases have affirmed the court's reasoning in *Dykes* while making clear that the same kind of private easement is held by an owner of property abutting an existing street. *See, e.g., Town of Palm Valley v. Johnson*, 17 S.W.3d 281, 288 (Tex. App.—Corpus Christi–Edinburg 2000) ("A private easement in a street may be acquired either as a purchaser in a subdivision with reference to a recorded plat or map, like the plaintiffs in *Dykes* or as an abutting property owner.") (interior citations omitted)), *pet. denied*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam). This private right of abutting property owners in existing streets has been recognized in addition to the owners' rights in common with the general public. *City of San Antonio v. Olivares*, 505 S.W.2d 526, 530 (Tex. 1974). The private right allows ingress and egress; "[i]t is a right of passageway to and from the property." *Id.*

It is undisputed that Alamo Street existed at the time Millwee purchased the Property and that the Property abutted Alamo Street. Thus, Millwee has always had a private easement in Alamo Street, just as Dykes did in the street drawn on his plat.

Evidence of such an easement is inherent in the elements of section 65.015, which provides its exceptional injunctive remedy to abutting landowners. We reject the City's contention in this case that any separate statutory ground is necessary for an abutting landowner to qualify for relief under section 65.015. And we reaffirm our understanding, expressed in *Millwee II*, that section 65.015 provides a right to enjoin the closing of a street when a landowner meets its requirements:

> Further, [in *Dykes*] the supreme court recognized that a home-rule city's statutory right to vacate, abandon, or close streets and alleys is subject to the requirements of section 65.015, "which allows abutting owners to enjoin such action if they have not released any claim for damages they might have or have not been paid compensation through a condemnation proceeding." *Dykes,* 406 S.W.2d at 181. While an abutting landowner does not have the right to determine when a street will be opened by the public, *id.* at 182, the landowner retains rights under section 65.015 and the constitution.

*Millwee-Jackson II*, 2014 WL 1413559, at \*8.

We have concluded that sufficient evidence at trial established that Alamo Street remains closed and that section 65.015 provides a right to an injunction when a city closes a street without compensating—or being released by—an abutting landowner. The City's failure to compensate Millwee for closing Alamo Street was thus, by statute, a wrongful act that supports the trial court's award of injunctive relief.

*Weighing the Equities*

The City also argues that the trial court erroneously granted the permanent injunction because "the record does not affirmatively indicate the court weighed the

–20–

probable harm to Millwee if the permanent injunction was erroneously denied against the probable harm to the City if the permanent injunction was erroneously granted." The City relies upon Justice Guzman's concurring opinion in *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 809–11 (Tex. 2014), which stressed the importance of a trial court's procedural obligation to place on the record its consideration of the competing burdens on the parties depending on whether the injunction is granted or denied. In this case, we need look no farther than the trial court's judgment to be assured that the trial judge never lost sight of the equitable nature of these proceedings and the burden that would be borne by the City if it were ordered to rebuild and maintain Alamo Street. As we quoted above, the judgment includes a safe harbor paragraph stating that:

> the City of Dallas will not be in contempt of this Final Judgment, if within a reasonable time instead of opening and paving Alamo Street the City of Dallas commences a condemnation suit to ascertain the Plaintiffs' damages for the abandonment of Alamo Street as prescribed in the Texas Civil Practice and Remedies Code section 65.015.

A safe harbor is "something (as a statutory or regulatory provision) that provides protection (as from a penalty or liability)." *See* "Safe harbor," *Merriam-Webster.com Legal Dictionary*, Merriam-Webster, https://www.merriam-webster.com/legal/safe%20harbor (last visited February 8, 2023). The trial court's safe harbor provision establishes that the trial judge indeed considered the "equities" the City wants weighed: i.e., "the burden on the City to reacquire the right-of-way from DART and [to] construct an extension of Alamo Street to Houston Street." The

–21–

judgment allows the City to escape those costs completely if it commences a suit to condemn the Property and to compensate Millwee. We have no concern that the trial court failed to weigh the equities raised by this case.

The trial court did not abuse its discretion when it granted the permanent injunction. We overrule the City's second issue.

## The Partial Summary Judgment

In its third issue, the City contends that the trial court erred by granting Millwee's Motion for Partial Summary Judgment on his claim for a declaratory judgment under Local Government Code chapter 245 (the Motion). We apply well-known standards in our review of traditional summary judgment motions. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). The movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. We consider the evidence in the light most favorable to the nonmovant. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Within the framework of these standards, we review the summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

*Proceedings on the Motion*

Millwee's Motion was a traditional one. It relied upon the Affidavit of Arthur Anderson—which attached seven exhibits, including discovery responses by the City, the 2001 FEMA floodplain boundary map for the vicinity, the 1983 Final Plat for the Property, the 1985 letter produced by the City outlining its plan for development of the Property, and "other pleadings and orders filed in this cause."

The Motion was rooted in chapter 245 of the Texas Local Government Code, especially section 245.002, which provides that:

> Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:
>
> (1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or
>
> (2) a plan for development of real property or plat application is filed with a regulatory agency.

TEX. LOC. GOV'T CODE ANN. § 245.002(a). Stated simply, this section mandates that regulatory requirements in place when a project begins will govern rulings in that project going forward. Courts have described the effect of this statute being to "freeze" the regulatory authority's land-use regulations as they existed at the time the first permit application was filed through completion of the project. *See, e.g., CMST Dev., LLC v. City of Austin*, No. 03-20-00567-CV, 2022 WL 467789, at *3 (Tex. App.—Austin Feb. 16, 2022, no pet.) (mem. op.). A "project" in this context is defined as "an endeavor over which a regulatory agency exerts its jurisdiction and

–23–

for which one or more permits are required to initiate, continue, or complete the endeavor." *Id.* § 245.001(3). And when a series of permits is required:

> the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

*Id.* § 245.002(b).[5]

The Motion contended that the 1983 plat was the first permit in the series of permits for Millwee's project. The City responded,[6] arguing that: neither Millwee's 1983 plat nor its 1985 letter agreement identified a "project" protected by chapter 245; the City's flood-control regulations are within a flood plan established by a federal flood control project; chapter 245 exemptions for zoning and prevention of imminent harm apply in this case; and Millwee had no project in progress by September 1, 1997, the operative date for the statute to apply.

In an order signed December 22, 2015, then trial judge Molberg granted summary judgment, decreeing that "the 2001 FEMA 100-year floodplain boundaries shall apply to [Millwee's] property." Judge Evans reiterated that finding and made the following conclusions of law:

---

[5] This section specifies that all permits that are required for the project are considered to be a single series of permits. Such a series specifically includes "[p]reliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats." *Id.*

[6] The full title of the City's response was Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment and Defendant's Plea to the Jurisdiction Both as to the Declaratory Judgment and Attorney's Fees Claims. The City no longer urges jurisdictional arguments on this issue.

Based on the summary judgment, the Court concludes [Millwee's] September 23, 1983 final plat for the Property is the first in the series of permits for the Property pursuant to Chapter 245 of the Texas Local Government Code and the 2001 FEMA 100-year floodplain boundaries apply to the Property in accordance with § 245.002, TEX. LOC. GOV'T CODE.

*The City's Appellate Challenges*

The City raises three challenges to the partial summary judgment on appeal. We address them in turn.

(1)     Millwee's request for a declaration was
        duplicative of his claim for inverse condemnation.

The City contends Millwee's request for a declaration of its chapter 245 rights was improper because it duplicated his claim for inverse condemnation, which contended that "[t]he actions of the City . . . constitute a taking, damaging, and/or destroying of [Millwee's] property rights for, or application to, public use without adequate compensation having been made." As his remedy for the alleged taking, Millwee sought "damages in an amount sufficient to compensate [Millwee] for the temporary and/or permanent taking, damaging, and/or destroying of [Millwee's] property rights, such amount to be determined by the trier of fact in this case."

Millwee's request for declaratory relief, on the other hand, sought "a declaration under Chapter 37 of the Texas Civil Practice and Remedies Code that development of the Property shall be in accordance with the 2001 FEMA floodplain map and not local floodplain studies." The summary judgment order gave precisely that remedy, a declaration of which floodplain map would govern development of

the Property. The trial court made no ruling that the City had taken Millwee's Property without adequate compensation; it made no award of damages. Instead, it resolved a dispute between the parties as to what regulations would govern a determination of the value of the Property.

The dispute resolved a question of law: the existence and extent of Millwee's rights under chapter 245. Those rights, according to chapter 245 itself, may be determined through a request for declaratory relief. *See* LOC. GOV'T § 245.006(a) ("This chapter may be enforced only through mandamus or declaratory or injunctive relief."); *see also FLCT, Ltd. v. City of Frisco*, 493 S.W.3d 238, 252 (Tex. App.—Fort Worth 2016, pet. denied) (property owners properly employed request for declaratory relief to obtain determination of existence and extent of their rights under chapter 245 to develop and use property). We discern no error in the trial court's use of declaratory relief to resolve the clearly disputed question of Millwee's chapter 245 rights. The declaration gave the parties certainty in terms of which regulations would guide the measure of damages if any were to be awarded. And "[b]ecause the proper measure of damages is a question of law, it is an appropriate matter for summary judgment." *Coble v. City of Mansfield*, 134 S.W.3d 449, 454 (Tex. App.—Fort Worth 2004, no pet.) (citing *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex. 2001)).

Finally, this declaratory relief does not run afoul of the prohibition against using a declaratory judgment claim to obtain otherwise impermissible attorney's

fees. *See Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 268 (Tex. 2021). "A party may not seek declaratory relief simply to pave the way to recover attorney's fees." *Citibank (S. Dakota), N.A. v. Durden*, No. 05-11-00154-CV, 2012 WL 6096569, at *3 (Tex. App.—Dallas Dec. 7, 2012, no pet.) (mem. op.). Although Millwee's Motion initially requested attorney's fees, it withdrew that request in its summary judgment Reply. Thus, attorney's fees are not relevant to this appeal.

We reject the City's argument that the request for a declaration of the proper regulations governing the Property was duplicative of any substantive claim by Millwee.

(2)     Millwee failed to offer substantial evidence of
        <u>an original application for a permit to develop a project</u>

Millwee's Motion relied upon his 1983 plat and the 1985 letter to him from the City's Director of Public Works as evidence of his application for an initial permit for his intended project under chapter 245. The chapter defines a "permit" as:

> a license, certificate, approval, registration, consent, permit, contract or other agreement for construction related to, or provision of, service from a water or wastewater utility owned, operated, or controlled by a regulatory agency, or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought.

LOC. GOV'T § 245.001(1). In this context, a project is "an endeavor" subject to the City's jurisdiction that requires one or more permits to be accomplished. *Id.* at § 245.001(3).

–27–

The City argues that neither Millwee's 1983 plat nor the 1985 letter evidences the filing of an application for a permit. It contends that the plat "does not reflect any endeavor on the Property" and the letter "contemplates [only] future actions by Millwee" involving plans to be submitted for review. The documents, according to the City, reflect "mere discussions or correspondence regarding possible development."

The City reads chapter 245 too narrowly. The 1983 plat can certainly be understood as Millwee's initial effort to obtain the City's consent or approval to initiate its project. *See id.* § 245.001(1). Chapter 245 employs the term "plat" a number of times, *see id.* § 245.002(a), (a-1), (b), (d), but it is not a defined term. "Undefined terms in a statute are typically given their ordinary meaning." *Levatino v. Apple Tree Cafe Touring, Inc.*, 486 S.W.3d 724, 728 (Tex. App.—Dallas 2016, pet. denied) (quoting *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 180 (Tex. 2013) (per curiam)). A plat is "a plan, map, or chart of a piece of land with actual or proposed features (such as lots)." *See* "Plat," *Merriam-Webster.com Legal Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/plat (last visited February 8, 2023). Millwee's 1983 plat is indeed a plan or map of his Property with actual features (including detailed water and sewer plans) and at least one proposed feature (the location of the "future bridge"). We conclude that the 1983 plat satisfies the requirement of "an original application or plan for development or plat application" for Millwee's rights under chapter 245 to accrue. Loc. Gov't

–28–

§ 245.002(a-1) ("Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought.").

      (3)    Millwee failed to offer substantial evidence of a subsequent application <u>for a permit to establish violation of his vested property rights</u>.

The City contends that for Millwee to prevail on his Motion, he must offer evidence that a *subsequent* application for a permit was denied or wrongly decided in violation of chapter 245. The City relies on *Jacks v. Zoning Board of Adjustment*, No. 07-18-00174-CV, 2019 WL 2998807 (Tex. App.—Amarillo July 9, 2019, pet. denied) (mem. op.) for the proposition that Millwee could not invoke a claim for vested rights absent evidence of a violation of those rights.

Initially, we interpret our sister court's holding in *Jacks* differently than the City does. The opinion states that Jacks purchased a piece of property in a residential subdivision; he wanted to build a commercial laundromat on the property. *Id.* at *1. Jacks claimed that—because the original plan for the subdivision had been filed with the City in 1960—he possessed vested rights to application of zoning laws and regulations that were in effect in 1960. *Id.* He received "an e-mail 'denial' from the City's Planning Manager," and appealed that decision to the Board.[7] *Id.* The Board

---

[7] The opinion does not explain precisely what was requested by Jacks. Nor does it specify what was "denied" by the Planning Manager or the grounds for the denial.

denied his appeal because: "Jacks has not identified an application for a permit that he has filed with the Board that has been denied or that has been wrongly decided under current laws or regulations rather than under the laws and regulations that existed in 1960." *Id.* at *2. Indeed, the opinion goes on to state that Jacks did not file *any* application for a permit with the Board.[8] *Id.* It is clear that Jacks did not initiate the permitting process in 1960, but he wanted to rely upon any chapter 245 "freeze" that would have been helpful for his laundromat plan. While the opinion contains few factual details, it appears that Jacks either (1) submitted a permit application that was denied based upon the very 1960 law he claimed rights under, or (2) he did not submit a permit application to the proper regulatory authority at all. *See id.* In either case, he would have had no complaint under chapter 245.

The City focuses its reading of *Jacks* on a single sentence: "The statute clearly and unambiguously calls for the filing of a subsequent application for a permit as necessary to invoke a claim of vested rights." *Id.* Again, Jacks did not file the initial application for a permit on his property, so he had to file one of his own—a "subsequent" application—for any ruling to be made concerning his rights under chapter 245. The City interprets that requirement for the developer in *Jacks* to mean that "the denial of a subsequent application is an element of a cause of action for

---

8 "[W]e cannot conclude that the trial court erred in granting the Board's summary judgment because there is no evidence that Jacks properly raised the issue of his vested rights by filing an application for a permit. We also cannot conclude that the Board failed to properly analyze and apply chapter 245 because Jacks did not properly invoke his claim of vested rights by filing an application for a permit with the Board."

violation of the vested rights statute." We do not agree that *Jacks* should be understood as identifying such an element in all chapter 245 cases.

More importantly for our analysis, Millwee has not brought "a cause of action for violation of the vested rights statute" by the City. He has sought only a ruling on which floodplain regulations will govern development of his Property. He could seek such a ruling by declaratory judgment because his rights to develop the Property would be affected by the court's construction of chapter 245. *See*. CIV. PRAC. & REM. § 37.001(a). We conclude that no ruling in *Jacks* affects Millwee's right to summary judgment in this case.

Millwee established that he was entitled to partial summary judgment on his Motion. The trial court did not err in granting the Motion, and the partial summary judgment was properly incorporated into the court's final judgment in this case. We overrule the City's third issue.

## MILLWEE'S CROSS APPEAL

Millwee urges one cross issue on appeal, arguing that the trial court erred by denying his inverse condemnation claim. "If a governmental entity takes, damages, or destroys property for public use without process or proper condemnation proceedings, governmental immunity is waived, and an action for inverse condemnation will lie." *City of Dallas v. Zetterlund*, 261 S.W.3d 824, 828 (Tex. App.—Dallas 2008, no pet.). A plaintiff who seeks a takings recovery must establish that the government "intentionally took or damaged [his] property for public use, or

–31–

was substantially certain that would be the result." *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016). Takings may be classified as physical or regulatory. *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 622 (Tex. 2021). In this case, Millwee pleaded a regulatory takings claim. Such a taking occurs "when the government restricts a property owner's rights to such an extent as to become the functional equivalent of a physical seizure." *Id.* We determine whether a taking has occurred as a question of law. *Kerr*, 499 S.W.3d at 806.

Millwee actually urged two types of regulatory takings in the trial court: (1) an acquisitory intent—or unfair advantage—taking, which stressed the City's focus on various governmental projects[9] together with the closure of Alamo Street; and (2) an unreasonable interference claim, which stressed the effect of the closing of Alamo Street on Millwee's ability to develop the Property. While Millwee's arguments—both factual and legal—in support of these theories are complex, at their heart they remain tied inextricably to the City's closure of Alamo Street.

We have already concluded that the City acted wrongfully in closing the street as it did. We have concluded that the trial court did not err in imposing its remedy, which was to give the City its choice of reopening and maintaining Alamo Street or initiating a condemnation suit to compensate Millwee for the closure. If the City

---

[9] Millwee charges the City with using its advantage to his Property's detriment when considering such projects as the Connection (involving the City's trail system), Pegasus Project (involving widening of Stemmons Freeway), and development of the neighboring Stemmons Park.

chooses the latter option, Millwee must receive the Property's market value. TEX. PROP. CODE ANN. § 21.042; *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). If Millwee were to prevail on his inverse condemnation claim, he would recover that same amount. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) (inverse condemnation is cause of action against governmental defendant to recover value of property taken in fact by governmental defendant without formal exercise of power of eminent domain). Thus, Millwee's superior recovery is that granted by the trial court, a recovery that allows for at least the possibility that Alamo Street could be reopened and maintained.[10]

We need not address the substantive merits of Millwee's inverse condemnation claim because it could give him no greater recovery than the one we have affirmed. Accordingly, we overrule Millwee's cross issue.

---

[10] Millwee's pleadings confirm that his damages recovery would be the same under these claims. For his inverse condemnation claim, Millwee pleaded:

> Plaintiffs seek damages in an amount sufficient to compensate them for the temporary and/or permanent taking, damaging, and/or destroying of Plaintiffs' property rights, such amount to be determined by the trier of fact in this case.

And for his injunction claim, he pleaded:

> The City should be ordered to commence a condemnation action against Millwee and the Property under §65.015, TEX. CIV. PRAC. & REM. CODE, if the City refuses to keep Alamo Street in an open, drivable condition without Millwee's consent.

**Conclusion**

We affirm the trial court's judgment.

/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE

200611F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

THE CITY OF DALLAS, Appellant

No. 05-20-00611-CV     V.

MILLWEE-JACKSON JOINT
VENTURE AND STEPHEN M.
MILLWEE, Appellees

On Appeal from the 95th District
Court, Dallas County, Texas
Trial Court Cause No. DC-04-07287-
D.
Opinion delivered by Justice
Pedersen, III. Justices Goldstein and
Smith participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Millwee-Jackson Joint Venture and Stephen M. Millwee recover their costs of this appeal from appellant the City of Dallas.

Judgment entered February 8, 2023